[Crim. No. 25181. Second Dist., Div. Five. Jan. 9, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT HERMAN ALVAREZ, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Alan G. Novodor and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—On August 22, 1973, an information was filed charging defendant with the forcible rape of Terry F. on July 22, 1973. A second count of the information charged defendant with burglary.[1] The information also charged six prior felony convictions, one of which was a 1963 conviction for "statutory" rape. (Former Pen. Code, § 261, subd. 1.)

The case was twice tried to juries. The first jury was unable to reach a verdict after deliberating for more than a day and a half, and a mistrial was declared. At the time the jury stood seven to five.[2] The second trial started on January 16, 1974, and resulted in jury verdicts finding the defendant guilty on both counts. He was sentenced to state prison. No verdicts on the prior felonies were ever submitted to the jury, nor did the court refer to them in its judgment.[3]

### FACTS

On July 21, 1973, the victim Terry F., age 14, was spending the night at the home of Mrs. Cynthia S., as she customarily had on Friday and Saturday nights. Mrs. S. was out playing cards. Defendant and Mrs. S. had lived together until late June 1973, when they broke up. Terry's custom of spending the night with Mrs. S.' children had antedated the breakup between Mrs. S. and defendant. Terry knew defendant and they were friendly.

At about 10:30 p.m., Terry answered the telephone. She recognized defendant's voice. He asked whether Mrs. S. was home. Terry said Mrs. S. was not home, and that she did not know when she would be back.

Terry went to bed at about 11 p.m. She later awakened and noticed a man lying next to her. Although the man was wearing a nylon stocking over his head she recognized him as defendant from his voice, his mustache, and his smell. The man asked Terry who lived at the house and how many children were there. He then forcibly raped Terry. We

---

[1]The burglary charged was simply the entry into the residence in which defendant allegedly raped Terry F. Since the only question of substance at the trial was the identity of the rapist, the burglary count must stand or fall with the rape count.

[2]The record does not indicate whether the bare majority of seven jurors had voted for conviction or acquittal.

[3]Four of the prior felonies were found constitutionally invalid by the court during the first trial. Neither party directs us to that portion of the record which would explain how the other two fell by the wayside. The 1963 statutory rape conviction was used by the People as part of its affirmative case on the issue of guilt, as well as for impeachment.

shall refer to some of the details of the rape in connection with the major issue raised on this appeal.

When Mrs. S. returned home at about 2:30 a.m., Terry seemed petrified. She first told Mrs. S. only that a man had come into the house, but after being questioned by Mrs. S., told her about the rape.

A physical examination of Terry was conducted within a few hours. Her hymen was intact but there was physical evidence of some penetration. She had not yet reached sexual maturity. She was four feet, nine inches tall.

A criminologist of the Los Angeles Police Department testified that a yellow stain on Terry's panties showed the presence of semen and sperm. He had not made any tests to eliminate defendant as the donor of the sperm.

The victim of the 1963 statutory rape, Miss Susan M., testified, over prolonged and strenuous objection, to the details of that crime. The admissibility of her testimony presents the major issue on this appeal.

The defense was an alibi. A restaurant waitress testified that on July 21, defendant had come to the restaurant at about 10 p.m., and stayed for an "hour or so." Defendant's sister, with whom he was living, testified that he returned to their house at about 11 p.m., when both she and defendant went to sleep. Defendant himself testified. He admitted calling Mrs. S.' home from the restaurant. He then walked home, had a brief conversation with his sister and went to sleep.

There was some prosecution rebuttal. It included testimony by Mrs. S. to the effect that defendant's sister had told her that on the evening of July 21, she last saw defendant at 9:30 p.m. She and her boyfriend then went out.

## DISCUSSION

■ The first point raised by defendant in this court is that the trial court erred in not permitting him to cross-examine the criminologist concerning his failure to perform tests to eliminate defendant as the donor of the sperm found on Terry's panties.

The trial court sustained a prosecution objection to such cross-examination, acting expressly under section 352 of the Evidence Code.[4]

When defense counsel during the cross-examination of the witness attempted to get into the subject of semen-typing, the prosecution objected. The jury was excused. The court then permitted counsel to elicit, from the witness, just what semen-typing can and cannot prove or disprove. While the record is not as clear as it might be, this is the substance of his testimony: Semen can be typed in much the same manner as blood—A, B, AB, O, and so forth—and matched with other body fluids, such as blood, saliva or perspiration of the alleged donor. However, about 20 percent of the male population do not secrete the proteins necessary for semen typing. Further, any attempt to type the semen on Terry's panties would have led to an unreliable result because it would have been reasonable to assume that her own perspiration would have become mixed up with the semen. Nevertheless, it might have been possible to eliminate defendant as the donor of the semen, had tests shown that he had—for example—type A blood, but that the semen was type B. One of the reasons why no such elimination of defendant was even attempted was that the panties had been handled by a number of unknown persons who could have contributed their own perspiration to the semen; further, factors contributing to unreliability would have been bacterial contamination of the material, and a strong possibility that the cloth itself would contribute to the analysis and obscure its results. These factors would not just simply prevent typing, but could cause erroneous typing.[5]

Further examination of the witness on the subject of semen-typing became highly technical and is somewhat hard to follow. Part of it may be due to the fact that the witness never really claimed to be an expert on semen-typing.[6]

---

[4] ". . . Well, I have listened to the arguments. I have listened to the testimony that has been elicited. I have sat at the hearing outside the presence of the jury, and I find that at this time that the probative value of the evidence, while it may be relevant evidence, is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues and will create substantial misleading the jury. So I do sustain the objection at this time."

[5] The witness gave one example: ". . . No, the problem would be—let's say the person, we test the person's spit for blood typing factors. We find out he is a secreter and what type, either A, B, or O, or AB. Then we examine the cloth. We may find out that assuming he is an A, we might find out that the cloth contributes to the A factors, the A analysis. So, right there the results are meaningless because we don't know if the typing is from the presumed, you know, the arrestee, or from the cloth, itself. So, all you can say is the result is inconclusive, frankly, meaningless."

[6] One interchange between defense counsel and the witness was as follows:
"Q. Are you saying that you couldn't answer my question, then?
"Let's say you started with type B. It became contaminated by bacteria, would that

To summarize: the defense was not trying to show that semen-typing had been undertaken and its results suppressed; nor was there any suggestion that the defense had been prevented from causing its own analysis to be made. The most it could hope to gain from the cross-examination was an instruction based on the principle of section 412 of the Evidence Code that: "[i]f weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." In order to apply that rule the jury would have had to find affirmatively that it was within the power of the People to produce stronger evidence than was offered. This finding would have had to be based on the testimony of an expert who evidently had no faith in the result of the analysis he did not make and who, admittedly, had not even read relevant literature on the subject. There can be no quarrel with the trial court's determination that the admission of the evidence that no semen testing was performed would have had little probative value and would have posed the danger of confusing and misleading the jury.

■ This brings us to the major issue on this appeal: the admissibility of Miss M.'s testimony concerning her 1963 intercourse with defendant, which is thus summarized in the People's brief: "On February 18, 1963, Susan M., who was 13 years old, lived with her mother in downtown Long Beach. Miss M. knew defendant. Defendant was a close friend of Miss M.'s mother. Defendant was working at the Old Mexico Cafe, which was located approximately three blocks from where Miss M. lived. Susan M. was approximately five feet two inches tall and weighed one hundred pounds.

"At approximately 10 p.m. on February 18, 1963, Miss M.'s mother left their house and went to the Old Mexico Cafe where she worked. At approximately 10:30 p.m., defendant knocked on the door of the house. Miss M. let defendant into the house.

"Defendant attempted to talk Miss M. into having 'intercourse' with him. Defendant removed Miss M.'s skirt and undergarments. However, defendant did not remove Miss M.'s blouse or uppergarments. Defendant lowered his trousers, but he did not remove them. Miss M.

---

bacteria change that to type A?

"A. I will tell you, *I haven't read that in the literature, but I suspect it is possible because the bacteria do contain enzymes, that's fact number one.*

"Fact number two is that the enzymes can convert the molecules from—they can affect different parts of molecules, so what would originally be B may be turned into something else, so, it's another area of doubt."

attempted to scream, and defendant covered her mouth with his hand. Defendant had an act of sexual intercourse with Miss M."

To this summary we merely add the following: Defendant not only attempted to talk Susan into having intercourse with him, he succeeded: the act was committed quite without force.[7] No weapon was displayed.

Further, it should be noted that the record does not indicate, one way or another, whether Susan M. had reached physical sexual maturity in 1963.

At this point some of the details concerning the charged rape must be set forth. Terry testified that the rapist put her on the edge of the bed, took off her pants and panties all the way and "molested" her. He

---

[7]Susan's precise testimony was as follows:
"Q. And, did both of you sit at a certain location in the apartment?
"A. The couch, the only place there was to sit.
"Q. And, did he make an advance at you?
"A. Yes, he did.
"Q. What did he do?
"A. He did the usual things that people do, the kissing and that, and talking.
"Q. All right.
  "Now, this happened some ten years ago?
"A. Eleven.
"Q. All right.
  "I know this is rather embarrassing for you, but we have to talk about the details.
"A. Mm hmm.
"Q. Of what happened next.
  "Now, did the defendant try to talk you into something at that time?
"A. Yes, he did.
"Q. And what was the subject, what was he trying to talk you into?
"A. Intercourse.
"Q. Intercourse?
  "Do you recall about what Mr. Alvarez said to you about intercourse?
"A. Things to the effect that everybody did it and it wouldn't hurt and it wasn't harmful, various things like that.
"Q. He said it wouldn't hurt?
"A. Mm hmm.
"Q. Had you ever had intercourse before that day?
"A. No, I hadn't.
"Q. All right.
  "Did Mr. Alvarez then remove any of your garments?
"A. Yes, he did."
Out of the presence of the jury Susan had testified as follows:
"Q. And, you didn't know what he was leading up to, is that correct?
"A. Oh, I knew what he was leading up to, yeah.
"Q. Well, what I want to get at, in other words, I will just ask you, I think the last time you testified he more or less—if we can use the term 'sweet-talked' you into this?
"A. Persuaded me, it was more or less.
"Q. By persuasion?
"A. Yes.
"Q. And not by force?
"A. Right."

himself "just unzippered his pants [and] pulled down his underwear." He also took off his belt. She did not scream because she had been told to be quiet. When she started to make some noise the attacker took out a knife, told her again to be quiet, and put it to her neck. Before any of this happened Terry had attempted to get away from the attacker. Something "like wrestling" had ensued. During the struggle the assailant put his hand over her mouth and told her to be quiet.

The only disputed issue on which Susan M.'s testimony was admissible was the identity of the person who raped Terry F. ■ For evidence of other crimes to be admissible on that issue, "[t]he device *must be so unusual and distinctive as to be like a signature.*" (McCormick, Evidence (2d ed. 1972) § 190, p. 449. Italics added.) This principle was fully explained in *People v. Haston,* 69 Cal.2d 233, 244-247 [70 Cal.Rptr. 419, 444 P.2d 91]:[8] " . . . Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (69 Cal.2d at p. 246.)

■ A recent Supreme Court decision on the issue of admissibility of other crimes—unfortunately decided sometime after the trial in this case—is *People v. Thornton,* 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]. While *Haston* involved a series of robberies, *Thornton* resembles this case more closely in that the basic crimes charged against the defendant were sexual assaults on three different victims. The only issue on which strikingly similar sexual assaults on two additional victims were admissible, was, as here, the identity of the perpetrator of the charged offenses: "It should be noted at the outset that the only issue upon which the subject evidence was relevant was that of the *identity* of the perpetrator of the charged offenses. The defense raised no issue as to the intent, knowledge, or motive of the perpetrator but sought only to show that defendant was not he. In this regard the instant case is similar to the

[8]*Haston* undoubtedly was a major clarification of our law on the subject. In footnote 22 of the opinion (*id.,* pp. 250-252) the Supreme Court disapproved of all prior decisions inconsistent with the *Haston* analysis. It did not undertake the task of identifying all such cases, but merely referred to seven relatively recent decisions by way of example. Three of those—*People v. Perez,* 65 Cal.2d 615, 618-619 [55 Cal.Rptr. 909, 422 P.2d 597]; *People v. Rosoto,* 58 Cal.2d 304, 329-333 [23 Cal.Rptr. 779, 373 P.2d 867]; and *People v. Coefield,* 37 Cal.2d 865, 869-870 [236 P.2d 570]—were its own. It is fair to say that all California cases on the point which antedate *Haston* are suspect and must be re-examined in the light of that case.

cases of *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262 [70 Cal.Rptr. 438, 444 P.2d 110], *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64], and *People* v. *Banks* (1970) 2 Cal.3d 127 [84 Cal.Rptr. 367, 465 P.2d 263]—and is to be contrasted with cases such as *People* v. *Cramer* (1967) 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582], *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198], *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700], and *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841]." (11 Cal.3d at pp. 755-756, fn. 11 omitted.)

No analysis of the charged and uncharged offenses involved in *Thornton* need be attempted. While the Supreme Court held some of the crimes discussed not to be probative on the issue of identity, most of the evidence was held to have been properly received under an application of the *Haston* standards. A brief glance at the facts of *Thornton*—set forth at pages 757 through 760 of the opinion—demonstrates that, as far as distinctive characteristics are concerned, *Thornton* and this case simply are not comparable. Further, as the Supreme Court points out, all of the crimes shown in *Thornton,* charged and uncharged, were committed between February 14 and July 30 of the same year, 1966. Here, more than 10 years separate the Susan M. and Terry F. offenses!

More recently the Supreme Court decided *People* v. *Matson*, 13 Cal.3d 35 [117 Cal.Rptr. 664, 528 P.2d 752]. There the defendant was charged with forcible rape and burglary, alleged to have been committed 11 days apart. The precise issue on appeal was whether there had been an abuse of discretion in denying defendant's motion to sever the two counts. The court found no abuse, stating inter alia that under *Haston* standards the evidence on each count would have been admissible on the trial of the other count. What impressed the court is best stated in its own words: "[L]ying in wait for lone women leaving their apartments unlocked while making repeated trips at night to load or unload their cars. Additionally, a mere 11 days and a mile and a half separated the two crimes." (*Id.,* p. 39.) No further elaboration on the inapplicability of *Matson* is necessary.

Seeking to uphold the trial court's ruling by pointing to "an overwhelming number of marks common to the crimes" committed upon Susan M. and Terry F. the People stress the following points:

1. Both victims were "extremely young" and physically small in stature.

2. In both cases the perpetrator had been friendly with the victims before the commission of the crimes through a relationship with the victims' mothers.

3. In both cases he was in a position to know that the girls would be alone at the time of the attacks.

4. The "sexual techniques employed in each case showed remarkable similarities." Only the lower garments of both victims were removed. The perpetrator himself only lowered his pants but did not take them off. Both victims were silenced by having a hand placed over their mouths.[9]

It will be noted that the People's second and third points of similarity assume the *probandum* of the evidence: that the perpetrator of the attack on Terry was defendant! This leaves us with points one and four: the victims' ages and stature and the similarity in "technique."

Try as we might we cannot bring ourselves to conclude that these trivial similarities are rationally probative on the only issue on which this evidence was admissible: whether the perpetrator of the 1973 forcible rape on Terry was the same person who committed an act of statutory rape on Susan 10 years earlier.

It is, of course, undeniable that in deciding a question such as this, a great deal depends on a court's assumption of certain facts that it does not really know very much about. If it thinks that it is highly unlikely that in the course of a decade more than one male adult could act upon a physical interest in girls of 13 or 14, then, perhaps, the fact that defendant evinced such an interest in 1963 justifies an inference that a person who raped a 14-year-old victim in 1973, was, indeed, defendant. Unfortunately, however, even our limited information concerning the prevalence of sexual perversions in our community permits no such assumption.

Further, we simply cannot blind ourselves to other factors: given a desire to have illicit intercourse with a young female for the purpose of

---

[9]Actually Terry was silenced by having a hand placed over her mouth during the struggle preceding the act of rape. During the actual intercourse the rapist used a knife.

The People also claim that each victim was raped on the edge of a couch or a bed. This is not quite borne out by a fair reading of the record. Terry was raped on a bed, onto which her assailant forced her after some "wrestling." It is not clear that the intercourse itself took place on the "edge" of the bed. The intercourse with Susan M. took place on a couch. Asked whether she had assumed a position on the edge of the couch, she answered: "It was very possible. The couch was very narrow. Might have been on the edge of it, close to the edge."

gratifying a sexual desire of the moment, the similarities pointed to by the People are virtually the necessary concomitants of the crime. As defendant's counsel points out in his reply brief, neither defendant and Susan, nor Terry and her assailant were "lovers." In each case the man sought a quick, animalistic gratification of his sexual urge of the moment. The partial removal of undergarments adequately served that purpose. Nor can we attach any significance to the assailant's attempt to smother the victim's screams, whether before or during the act, whether with or without a knife. In each case a serious crime was being committed and any noise which might attract the attention of a third person was unwelcome. Finally, and most vitally, we simply cannot ignore the basic difference in approach: in 1963 defendant made no effort to disguise himself, displayed no weapon and accomplished his sexual objective entirely without the use of force. Compared to these distinctions all the so-called points of similarity, pale into insignificance.

Whatever may be the "necessarily uncertain assumptions about human behavior" (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 353 [41 L.Ed.2d 789, 813, 94 S.Ct. 2997] Blackmun, J. concurring), which enter into our determination, we find it impossible to say that—applying the *Haston* standard—the common marks, "considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety, and, in so doing, tend to suggest" that defendant, the perpetrator of the 1963 statutory rape was the perpetrator of the forcible rape of Terry, 10 years' later.

The error was clearly prejudicial, particularly in view of the fact that after the first trial at least five and possibly seven jurors voted to acquit.

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.