[Crim. No. 27789. Second Dist., Div. Five. Feb. 22, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD TAYLOR, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet H. Swoboda and William R. Weisman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant appeals his conviction on a charge of forcible rape. We affirm.

### FACTS

On January 6, 1975, the victim, G. O., left her home to go to work at 5:15 a.m. and walked to a bus stop: It was still dark. A man on a bicycle passed her. All that she noticed was that he wore a dark knit cap. A few minutes after G. O. and the man passed one another, he returned and grabbed her blouse from behind. He threw her down. A struggle ensued and she was dragged to a field a short distance away. She screamed, hit her assailant and attempted to escape. As she struggled, he hit her several times and told her that he would kill her if she did not shut up. He then dragged her to a bushy area in the field, pushed her down, removed the clothing below her waist and proceeded to have sexual intercourse with her against her will.

As G. O. was brought to this bushy area, a nearby resident heard her screams and went into his house to have his wife telephone the police. He then waited in front of the house about 15 minutes until the police arrived. He directed the officers to the field where G. O. was being raped. They heard her screams and ran toward her. Two shots were fired into the air; the assailant stood up and fled. The police pursued. In all, eight or nine officers were on the scene.

A chase followed. The assailant jumped a nearby wall and then climbed onto a roof. A pursuing officer, Maples, temporarily lost sight of him until he heard noises on the roof. Defendant was apprehended in the bushes surrounding the house on whose roof the assailant had been. He was handcuffed and placed in a patrol car. G. O. was brought to the patrol car where she identified defendant as the assailant. Fifteen minutes had elapsed between the flight and the identification. At the trial Officer Maples identified defendant as the man he had seen on the roof.

According to G. O., the assailant wore a woman's stocking over his face when he grabbed her from behind and dragged her across the field. On two occasions, as they wrestled across the field, he lifted his mask and she was able to see his face. During the rape her head was placed inside a pillowcase, but again she was twice able to lift the pillowcase and see her assailant's face which was no longer covered with the stocking. On the second occasion she saw his face "well." She identified a brown corduroy jacket as having been worn by the rapist.

Among the officers who arrived at the scene were Officers Gronke and Ventura. During the hour or so before the rape, they had twice seen defendant on a bicycle in the general area. On each occasion they stopped him for questioning. The second time they filled out a field interrogation (F.I.) card containing a description of defendant, including his clothing. Each officer testified that, when stopped by them, defendant was wearing a brown corduroy jacket. The card, however, although requested by defense counsel, could not be found.

A brown corduroy jacket and a knit cap were found at the scene of the rape after defendant was arrested.

Defendant's defense was mistaken identity. He testified that he left his home on his bicycle—a small Stingray with high handle bars—to seek a job at the Los Angeles airport. He stopped at a girlfriend's house for about an hour. Twenty minutes after leaving her house, he was first

stopped by Officers Gronke and Ventura. After the second stop, he decided to ride back home. When he reached the area of the bus stop, where, according to G. O., she was first accosted, he saw money scattered on the ground and stopped to pick it up, still astride the bicycle. A police car came up, "making a lot of noise." He got off his bike, leaned it against some steps and jumped over a fence. He heard shots and screams. More officers arrived. He ran toward a hedge near an apartment building. He heard more shouts and commotion. Officers were on the roof of the building. Two officers, one of whom was Gronke, eventually located him with a flashlight and arrested him. He had never been on the roof.

On the night in question defendant was wearing a gray jacket. The arresting officer was unable to handcuff him because of the jacket. He pulled it off defendant, who never saw the jacket again. The jacket matched his gray pants. After the arrest defendant overheard a conversation between Officers Gronke and Ventura. Ventura said: "That looks like the same guy." He asked defendant where his jacket was, because Gronke did not know whether defendant was the person who had previously been stopped. Defendant said: "It's over there lying somewhere. You tore it off me."

Defendant's mother corroborated him with respect to the jacket: she had never seen her son wearing or in possession of the brown jacket recovered at the scene of the rape.

The medical examination of G. O. on January 6 revealed that she was having a moderate to heavy menstrual flow. The doctor shortly thereafter examined defendant and found no evidence of blood or dried seminal fluid on his genitals. The examination of genitals was performed visually and without benefit of any instruments; blood would have dried, perhaps to a color approximating that of defendant's skin. The doctor, however, had checked the area closely for that reason. The examination had taken place about an hour and a half after the rape.

In rebuttal, the People offered evidence to the effect that immediately after his arrest, defendant had told a different story. After being advised of his rights, defendant had said that after he stopped to pick up the change and saw the police coming across the street, he followed another man over a wall and onto a roof where he was apprehended. He said that he heard another "dude with" a woman, but had nothing to do with it

and that he had followed this other man because he felt that he knew his way around.

Defendant took the stand as the surrebuttal witness and stated that he had never been on the roof or seen another man and that he had never so stated after his arrest.

Facts will be added in the discussion.

## DISCUSSION

Defendant contends that he was denied due process because the police were unable to produce the F.I. card. He claims that the card would have proved that less than one hour before the rape he wore clothing different from the brown corduroy jacket found at the scene.[1] He contends that this evidence was vital to his defense.

The springboard for defendant's point is *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. The *Hitch* holding—which involved the "intentional but nonmalicious destruction" of a breath-alyzer ampoule, its contents, and a reference ampoule (*id.,* at p. 652)—was summarized by the Supreme Court in *People* v. *Municipal Court (Ahnemann)* (1974) 12 Cal.3d 658, 662 [117 Cal.Rptr. 20, 527 P.2d 372], decided the same day—October 21, 1974: "In *Hitch* we hold (1) that these items constitute material evidence on the issue of guilt or innocence of the charge of driving a vehicle under the influence of intoxicating liquor; (2) that due process requires such evidence to be disclosed by the prosecution; (3) that since the prosecution has the duty to disclose such material evidence, the investigative agency involved in the test has the duty to preserve it for disclosure; (4) that if such evidence cannot be disclosed because of its intentional but nonmalicious destruction by the investigative officials, sanctions shall *in the future* be imposed for such nonpreservation and nondisclosure unless the conditions specified in our opinion in *Hitch* are satisfied; (5) that if such conditions are not met, the trial court shall apply sanctions for nondisclosure which under due process would not require dismissal of the action but merely

---

[1]Also involved is a minor issue with respect to the dark knit cap that the rapist wore according to the victim. Such a cap was also found at the scene of the rape. Defendant testified—and his mother corroborated—that he did not own or wear such a cap. Defendant claims that the F.I. card would not have described him as wearing a dark knit cap. The point with respect to the cap is, however, entirely submerged in the jacket controversy, since a failure to mention the cap would have proved only that defendant did not have it on his head at the time of the detentions.

exclusion from evidence of the *results* of the breathalyzer test; and (6) that our holding in *Hitch* shall apply only to chemical tests of breath administered after the date of filing of that opinion." (Italics in original.)[2]

The Attorney General has chosen not to contest the threshold issue: whether *Hitch* applies to physical evidence such as F.I. cards which, unlike breathalyzer paraphernalia, are not necessarily material evidence with respect to a crime of which the person detained and released may later be accused. We shall therefore assume, solely for the sake of argument, that *Hitch* principles oblige police departments to "adhere to rigorous and systematic procedures" (*People* v. *Hitch, supra,* 12 Cal.3d 641, 652-653) to preserve F.I. cards—at least in comparable situations.[3]

■ Nevertheless, it is clear that the *Hitch* issue was not timely raised below. We do not attempt to promulgate a procedural code on the precise manner and timing of motions and objections based on *Hitch.* Common sense, however, dictates that once the evidence which a successful assertion of a *Hitch* issue would suppress, has been received without objection, it is too late.

This is what happened: the parties went to trial without any defense attempt to discover the card, let alone a motion analogous to the one made in *Hitch*—to suppress certain prosecution evidence if the card could not be found or accounted for under *Hitch* standards. Gronke and Ventura testified entirely without objection that at the time of the two earlier detentions defendant had worn a brown jacket. The fact that a card had been made out and turned in was established in offhand fashion. The officers were requested to locate it. Only after it appeared that the card could not be found and the People had rested except for the introduction of certain exhibits, did defense counsel claim that his client "had been denied due process of law" because the card had been lost "obviously through negligence of the police agency." He asked that the

---

[2]Since the F.I. card was made out and lost several weeks after the *Hitch* decision, retroactivity is no problem.

[3]In this case, the officers who made out the F.I. card knew, even before they turned it in at the end of their shift, that the subject interviewed had just been arrested on a serious charge. It would have taken little imagination to appreciate that the various data recorded on the card could become relevant in a later prosecution.

action be dismissed.[4] That was the first inkling to the prosecution that counsel was raising an issue which placed on it a burden of showing that the police had "established, enforced and attempted in good faith to adhere to rigorous and systematic procedures designed to preserve" F.I. cards. (*People v. Hitch, supra,* 12 Cal.3d at pp. 652-653.)

The defense motion was too late. Analysis demonstrates that the maximum benefit which, by analogy to *Hitch,* the defense could have gained from a timely assertion of a *Hitch* issue was suppression of Gronke's and Ventura's testimony that defendant had been wearing a brown jacket earlier that night.

*Hitch* held that the proper sanction for an intentional but nonmalicious loss of breathalyzer paraphernalia is suppression of the test results. The court declined to hold that such loss creates an inference that "the ampoules could demonstrate innocence." (*Id.,* at p. 653, fns. 6, 7.) Here, too, the loss of the card was, at most, "nonmalicious."[5] Assuming a duty to maintain a file of F.I. cards that parallels the duty in *Hitch* to retain ampoules, it follows that defendant would have been entitled to no more than suppression of police testimony which might have been contradicted by the F.I. card. That testimony, however, was received entirely without objection. Thus, defendant waived any *Hitch* claim he might have had.

■ Moreover, in the light of the maximum benefit that the defense could have gained from the loss of the card, any error was harmless beyond any doubt. Viewed in the framework of the massive case which proved defendant's guilt to the point of demonstration, the officers' testimony that defendant had been wearing a brown jacket earlier that night was hardly worth mentioning. Defendant and his bicycle were at the scene. He was identified by the victim. He was observed on the roof onto which the police had chased the rapist. He changed his story. Both his post-arrest version of the events as well as his trial testimony postulated another cyclist who raped G. O. and miraculously escaped the

---

[4]Since defendant only claimed negligence, dismissal was far too drastic a remedy. Counsel also objected to the admission of the brown coat and cap found at the scene. By no stretch of the imagination would suppression of those items have been the appropriate sanction. In fact, it would have been of little benefit to defendant whose very point it was that he had not been wearing the brown coat presumably left by the rapist. In any event, whether the defense wanted too much or too little, it was too late.

[5]Certain bits and pieces of evidence concerning police procedures which did get into the record indicated that the police had a system of sorts for relating F.I. cards to investigations of actual crimes. It obviously was not perfect.

police cordon around the house in question, bicycle and all.[6] In addition, defendant failed to account for the time between the second detention and his arrest. Finally, he failed to call the most obvious witness who could have corroborated his claim that he was wearing a gray jacket—the girlfriend with whom he had spent an hour just before the first detention.

Finally, although it is clear that the card could have played an important role in establishing what the defendant was wearing before the crime and possibly adding credibility to his otherwise improbable version of the events, the loss of the card did not sweep the issue under a rug. The jury heard defendant's denial of ever having worn a brown corduroy jacket, as well as his mother's testimony. It also was aware of a discussion between Officers Gronke and Ventura on the subject whether the defendant was the same person whom they had stopped earlier during the night.[7] Thus, the loss of the card did not prevent defendant from attempting to establish that he never wore the brown jacket or the cap worn by the rapist.

In brief—recognizing that the production of the F.I. card might have strengthened the defense—we conclude that in view of the strength of the prosecution's case, its loss was harmless beyond any doubt.

Defendant's final two contentions deal with the trial court's refusal to give certain requested jury instructions. Defendant requested several argumentative instructions on the weakness and dangers of eyewitness identification. The point has no merit. (*People* v. *Purvis* (1963) 60 Cal.2d 323, 348 [33 Cal.Rptr. 104, 384 P.2d 424]; *People* v. *Green* (1969) 3 Cal.App.3d 240, 247 [83 Cal.Rptr. 491]; *People* v. *Lundy* (1969) 2 Cal.App.3d 939, 944 [82 Cal.Rptr. 815].)

■ The trial court did not err in refusing to instruct on section 412 of the Evidence Code to the following effect: "If weaker and less

[6]Defendant's bicycle was found in an area to the east of the open field where G. O. was raped—precisely where it would have been left if, as she testified, the rapist first passed her and then returned. Defendant's trial story would put the abandoned bicycle to the west of the field, next to the house.

[7]In answer to a defense question, Ventura seemed to agree that he and Gronke had a "discussion" or "argument" whether defendant was the person detained earlier that night and that this argument was triggered by Ventura's recollection of defendant "having a different coat *than the brown coat*" earlier that night. Fairly read, however, the record shows that at the time of the "argument" Ventura did not know that a brown coat had been found at the scene, and that any hesitancy about identifying defendant as the earlier detainee was due to the fact that defendant was not wearing *any* coat at the time of his arrest.

satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." Defense counsel requested this instruction in reference to the prosecution's failure to produce the F.I. card.

Section 412 only applies when it can be shown that a party is in fact in possession of or has access to better and stronger evidence than was presented. (*People* v. *Alvarez* (1975) 44 Cal.App.3d 375, 381 [118 Cal.Rptr. 602]; *People* v. *Simms* (1970) 10 Cal.App.3d 299, 312 [89 Cal.Rptr. 1].) The F.I. card was, indeed, lost and could not be found. The record presents no evidence to the contrary. However, the giving of the instruction could only have pointed up the defendant's own failure to call his girlfriend who, presumably, could have corroborated his version of his attire.

The judgment is affirmed.

Stephens, J., and Hastings, J., concurred.