[Crim. No. 8300. First Dist., Div. One. Oct. 1, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
LEROY JAMES MURRAY, Defendant and Appellant.

## COUNSEL

Isidoor Bornstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and John F. Henning, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.**—Following a trial to the court, defendant Leroy James Murray was convicted of robbery of the first degree (Pen. Code, § 211), and assault with a deadly weapon (Pen. Code, § 245). He appeals from the judgment which was thereafter entered.

■ Since he contends that his convictions were "clearly not supportable by the weight of the evidence," we must here apply the "substantial evidence" rule. "In reviewing the sufficiency of the evidence an appellate court 'must assume in favor of the verdict the existence of every fact that the [trier of fact] could reasonably deduce from the evidence and then determine whether or not a reasonable [trier of fact] could find the defendant guilty beyond a reasonable doubt.'" (*People* v. *Hall*, 62 Cal.2d 104, 109-110 [41 Cal.Rptr. 284, 396 P.2d 700].) The test on appeal is not whether an appellate court thinks a defendant guilty beyond a reasonable doubt, rather it is "whether there is substantial evidence to support the conclusion of the trier of fact." (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; accord: *People* v. *Newland,* 15 Cal.2d 678, 680 [104 P.2d 778]; Witkin, Cal. Criminal Procedure (1963) Appeal, §§ 683-685, pp. 666-669.)

Applying the foregoing rule there can be no doubt that Murray's convictions are supported by substantial evidence. And he makes no real contention to the contrary. Instead his argument seems to be that but for certain misconduct of the trial judge in bringing additional evidence into the case, there would not have been the required substantial evidence.

We proceed now to a discussion of Murray's claim of judicial misconduct.

The complaining witness Elworth Nelson testified that one evening in the "Top Hat," an Oakland bar, he declined Murray's offer to "get me a woman," and then left the premises. Approximately four hours later, at around 2:30 a.m., responding to a knock on his apartment door, Nelson was confronted by Murray. Murray displayed a pistol. He ordered Nelson to lie on the floor and bound and gagged him. He then extracted $8 from

Nelson's wallet and started searching other rooms of the apartment. Returning to Nelson, Murray found that he had loosened his bonds. He thereupon struck Nelson on the head with the pistol, and when the victim cried out, "police, police," shot him, inflicting a superficial wound on his neck. Two weeks later Nelson saw Murray and pointed him out to the police who arrested him. Nelson was the only witness on the People's case in chief.

In his turn, as a witness on his own behalf, Murray testified to the following. He had met Nelson at the bar. He remained there until 1 a.m. when he left in the company of one *"Bobby* Easley" who was the "security officer" at the bar, like "Burns or Pinkerton." Murray and *"Bobby* Easley" then went to another bar where they spent one hour before proceeding to a party in San Francisco where they remained until 7 a.m. He denied the assaults on Nelson.

At the close of the defense case Murray's counsel indicated that the security officer, *"Bobby* Easley," although subpoenaed, had failed to appear as a witness and that there was a bench warrant outstanding for him. The following then occurred:

"THE COURT: I understood, I thought I made it plain that I would like to hear from Mr. Easley if it has been possible to find him. I don't know whether your understanding was that you wished to waive a jury on the record as it now stands or whether or not you understood that I wanted to hear from Mr. Easley if he could be found. I would like to hear from Mr. Easley if he can be found.

"[DEFENSE COUNSEL]: Well—

"THE COURT: If you can't find him, why, that's another item. Irrespective of whether he is found or not found, and I would like to have him found if possible, . . . I would like to hear from Mr. Easley, wait and see if we can find him, rather than decide the question now on the evidence I have heard. I thought that was what we had made plain in chambers. Apparently there is some confusion. . . . Well, if we can't find him by tomorrow I will assume that he is not to be found. I will ask you, Mr. Murray, do you have any idea why Mr. Easley can't be found? THE DEFENDANT: This I can't understand, Your Honor, because I was with the guy, and the guy came up to me since I have been arrested, and also to the counselor, and told him that he don't see why they got this guy in court, and he taken the statement. He wished there is something he could do. He knew he was with me this night."

The next morning when court convened, to the court's inquiry, "Do we have Mr. Easley?", Murray's counsel responded, "Yes, he is present." One *"Bennie* Easley" then took the stand. He explained that he failed to

respond to the subpoena because he was in jail. He testified he was with Murray in San Francisco at the time Nelson testified he was robbed and assaulted in Oakland. His testimony, although generally corroborative of Murray's, differed substantially on the chronology of the events of the evening in question. He then explained that he was off duty that evening, that he regularly worked at the "Top Hat" from 7 p.m. to 2 a.m., and that his employer was "ABC Security."

The case was then recessed until the following morning at which time Wilbur Newell, operations manager of ABC Protection Service, *called as a witness by the court,* took the stand. He identified the "Bennie Easley," who had previously testified, as in fact "Joe Eddie Easley" whose employment with the ABC Protection Service was terminated December 1968, two months before the alleged offenses against Nelson. He then related that "Joe Eddie Easley" had an uncle "Bennie Easley" who was on duty as security officer at the "Top Hat" on the night of the alleged offenses.

The real "Bennie Easley," the uncle of "Joe Eddie Easley," was then called to the stand by Murray. He testified that "Joe Eddie Easley" was truly "Joe Eddie *Jones.*" He stated that he himself had worked in uniform at the "Top Hat" on the night in question. He left the bar about midnight and *he* took Murray to the San Francisco party. His nephew "Joe Eddie" was not with them; he may have been at the party but "but I didn't see him." He and Murray arrived back in Oakland around 5 a.m.

"Joe Eddie" who had remained in the courtroom then, despite appropriate admonition from the court, demanded to, and did, resume the witness stand "pro. per." He then testified, "I committed perjury. . . . Everything I said was false." Asked if Murray's testimony that he (Joe Eddie) had accompanied Murray to San Francisco on the night in question, could be true, he responded, "No, it can't."

Later, after the court's finding of Murray's guilt, Murray volunteered that he had testified falsely about being with "Bobby Easley" or "Benny Easley" who turned out to be "Joe Eddie Jones" on the night in question. He said that he just went along with "Jones' " story.

██ Murray's first assignment of judicial misconduct relates to the court calling as its witness the "Bennie Easley" who turned out to be "Joe Eddie Jones." We see neither misconduct nor error.

We note initially that although it may reasonably be considered that the witness was "called" by the court, this was obviously done to insure that Murray would have the benefit of an alibi witness who had apparently refused to respect the command of a subpoena.

Evidence Code section 775 provides as follows: "The court, *on its own motion* or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party. Such witnesses may be cross-examined by all parties to the action in such order as the court directs." (Italics added.)

■ *People* v. *Donovan,* 272 Cal.App.2d 413, 421-422 [77 Cal. Rptr. 285], states: "The right and duty of a trial court to call and examine witnesses cannot be seriously questioned. (Cf. Evid. Code, § 775; *People* v. *Corrigan,* 48 Cal.2d 551, 555 et seq. [310 P.2d 953].) As stated in *People* v. *Bowman,* 240 Cal.App.2d 358, 382 [49 Cal.Rptr. 772]: ' " 'The duty of a trial judge, particularly in criminal cases, is more than that of an umpire; and though his power to examine the witnesses should be exercised with discretion and in such a way as not to prejudice the rights of the prosecution or the accused, still he is not compelled to sit quietly by and see one wrongfully acquitted or unjustly punished when a few questions asked from the bench might elicit the truth. It is his primary duty to see that justice is done both to the accused and to the people. . . .' " ' " (See also *People* v. *Rigney,* 55 Cal.2d 236, 241-244 [10 Cal. Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186].)

Murray's remaining assignment of error, and judicial misconduct, relates to the witness Wilbur Newell, the operations manager of ABC Protection Service. It is not the *calling and examination* of this witness by the court which is criticized, but rather the court's discussion with him in the absence of counsel and Murray. As relevant to this contention the record shows the following:

"[DEFENSE COUNSEL]: Your Honor, at this time I would move for a mistrial on this matter and would state as the grounds therefor as being my remembrance that Mr. Newell talked to Your Honor—Your Honor, of course, being the trier of fact in this action presently—out of the presence of both counsel. I believe that Your Honor received certain facts relevant to the facts in this action from him. I believe, therefore, that these facts would enter into Your Honor's decision in the matter, and, therefore, I respectfully move for a mistrial.

"THE COURT: Well, all right. The Court will take moment of your motion and state for the record that it is true that Mr. Newell came into my chambers and we discussed, primarily, the identity of the witness Easley, what his true name was, his uncle's relationship to the ABC Security Services, his relationship, how they were each known by Mr. Newell. It is also true that something of the background of both of these gentlemen was

discussed by Mr. Newell. I am not considering anything in the decision I make in this case excepting that which I have heard on the witness stand in connection with this case. So, although it is correct that I did speak to Mr. Newell in chambers outside the presence of counsel, that it was to no prejudice to the defendant, and nothing that I heard in there is being, nor will it be considered by me in any decision that I make.

"The motion is denied."

■ In our consideration of the instant contention we bear in mind that here the court was the trier of fact. We consider it to be clear error under such circumstances for the court on its own motion to privately discuss matters critical to Murray's defense with a prospective witness. And the error is not necessarily cured by the court's statement that the out-of-court discussion would not "be considered by me in any decision I might make."

But we nevertheless have before us the remaining question whether the error was in fact prejudicial, resulting in a miscarriage of justice. (See Cal. Const., art. VI, § 13.)

■ It is noted that following his out-of-court conference with the judge, the witness took the stand and again related the matters which were the subject of the earlier discussion. Counsel for Murray was afforded full opportunity to, and did, cross-examine the witness. It does not appear that anything was privately told the court that was not repeated, this time without error, on the witness stand. For these reasons we perceive no possible prejudice. Applying the test of *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], we are of the opinion, after an examination of the entire cause, including the evidence, that it is not reasonably probable that a result more favorable to Murray would have been reached in the absence of the complained of error. We also declare a belief that such error was harmless beyond a reasonable doubt. (See *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.