94 Cal.App.3d 696 (1979)
156 Cal. Rptr. 268
THE PEOPLE, Plaintiff and Respondent,
v.
CLIFTON GEORGE KING et al., Defendants and Appellants.
Docket No. 31001.
Court of Appeals of California, Second District, Division Five.
June 18, 1979.
*698 COUNSEL
Richard H. Levin and Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Jonathan B. Steiner and James K. Stoddard, Deputy State Public Defenders, for Defendants and Appellants.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
STEPHENS, Acting P.J.
After a jury trial, appellants Clifton King and Denis Loupe each were found guilty of forcible rape (Pen. Code, § 261, subds. 2 & 3), sodomy (Pen. Code, § 286, subd. (c)), and oral copulation (Pen. Code, § 288a, subd. (c)). Appellants appeal from the judgments.
The evidence viewed in the light most favorable to the People as the prevailing party, is as follows.
On the evening of September 28, 1976, Miss K. played piano and organ at the Faith Home Assembly Church on West Adams in Los Angeles. Unable to obtain a ride home at the conclusion of the service at 12:10 a.m., she began walking east on Adams.[1] As she crossed Arlington, an unknown male Negro in an avocado green colored car slowed up and pointed east as if to say, "Do you want a ride?" Miss K. nodded. The car stopped and she got in. The man drove onto the freeway, driving at approximately 60 miles per hour. When he passed the Florence offramp she told him to pull over and get off at Manchester. She testified that when he failed to pull over, she opened the door so she could jump out. The man pointed an object in her side and told her to close the door. She was afraid. She kept telling him over and over, "Let me out of this car. I'll *699 walk back." He finally exited the freeway at Rosecrans and turned down 142d Street. After parking the car in a deserted area, he raped her. After that he circled the block three or four times, then stopped and ordered her out of the car. She was crying and her clothes were disheveled and "messed up."
Miss K. walked down to Vermont and turned north. She testified that she was crying as she was walking. Appellants King and Loupe were standing on the sidewalk in front of Loupe's house. As she passed them, King asked her what was wrong. She told them that she had just been raped and she needed a ride home to 79th and Normandie. Loupe asked her if she wanted something to eat or drink. She declined. King said that he would take her home.
They all got into the car, King in the driver's seat, Miss K. in the front passenger seat, and Loupe in the back seat. After she told them the circumstances of the rape earlier that morning, King tried to convince her to report the rape to the police. He told her he was a policeman.[2] She said she was not going to report it.[3] While they were driving, King lectured her on riding with strangers and on reporting the rape. Miss K. became very vexed with this lecturing. When King passed Normandie, Miss K. became concerned and said, "Hey, you missed the street. You missed the turn." King slammed on the brakes, then continued driving. Miss K. did not say anything else as they drove, though King continued to lecture her.[4] When they ended up in Holly Park, King stopped the car and said, "Well, be prepared. You're going to go through it again." Miss K. didn't say anything in response. However, to herself she said, "Oh, God, not again."
King got out of the car. Miss K. opened the door and let herself out, Loupe then got out also. Miss K., with Loupe and King escorting her by holding her arms, walked to the bleacher area at the park after King said, "Let's take her over in this direction." King directed her to "take off your *700 clothes." Miss K. did not say anything. She conformed to the order by taking down her underclothes to the ankles. Appellants unzipped their pants. King then said, "Suck, please."[5] During the next 10 minutes to an hour (depending on the witness) each appellant engaged in oral copulation, intercourse and sodomy with Miss K. At one point during intercourse with Loupe, Miss K. complained of pain in her vagina. She told Loupe to get off her. He refused and said if she screamed, "I'll hurt you worse."
Deputy Sheriff Patrick Schroeder and his partner while on routine patrol noticed appellant King's car parked in the Holly Park parking lot and drove in to check it out. He observed Miss K. and appellants near the bleacher area. As he approached, they were walking slowly.[6] Miss K. walked up to the deputies crying and hysterical and told them that she had been raped. She was taken to the Hawthorne Community Hospital where an examination was performed revealing semen in her anus and vagina. In addition the vaginal opening was found to be abraded and the mucousa of the rectum split and losing blood.
At the trial, Miss K. testified that she believed that her life was threatened and that she would have been killed had the police not arrived. She also testified that she had been raped on six prior occasions, four while hitchhiking, and that she had been raped over a period of time by a minister in the Bay Area. Miss K. never reported any of these rapes.
Appellants made an offer of proof seeking to introduce evidence of the prior incidents of rape on the theory that Miss K. was a 28-year-old very religious, unmarried woman who suffers from guilt concerning normal sexual activity and places herself in situations with strangers where the resulting sexual experience is not her responsibility. The court refused to permit questions concerning the circumstances of any of the prior rape incidents but did permit testimony by Dr. Blake Skrdla who performed a psychiatric evaluation[7] of Miss K. and determined that, although she could distinguish truth from fantasy, she was emotionally immature, and as a consequence tended to overreact in an histrionic fashion which *701 manifested itself in seductive behavior. He also testified that she suffered from guilt about normal sex.
Appellants' basic contentions of error are that: (1) the evidence is insufficient to establish the essential elements of resistance and forceful compulsion as a matter of law, (2) the testimony of the prosecution's chief witness was inherently improbable, (3) the exclusion of relevant evidence concerning the circumstances of the prior incidents of rape constitute prejudicial error and (4) the trial court's limitation upon cross-examination of the victim and the psychiatrist.
The rape count upon which defendants were convicted requires that the victim be "prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, ..." (Pen. Code, § 261, subd. 3.) Was there a resistance by the victim in this case, or, if not, was she prevented from resisting by threats of great bodily harm? (1) We conclude, as the jury did, that resistance was effectively prevented.
Under the usual tests on appeal, we conclude that the jury's evaluation of the witnesses, including the denials by both defendants of the sodomy acts (which the jury found to be true) and the testimony of the victim as to her fear (and the jury's belief of the genuineness of her testimony) are legally sufficient to support the convictions on this count. Defendants misled the victim as to their intent; they took her to an isolated park area; they escorted her, one on each arm, to the secluded location; they ordered her to perform the acts. The fact that there were two men of considerable size and obvious strength, and the no-help area to which she had been taken against her wishes suffices to supply the elements of reasonable expectation of great danger. Compliance with the orders of the men reasonably comports with the suppression of resistance. The fact that there were two sizeable men "escorting" her plus threats to harm her during intercourse, as well as the statement that she was "going to go through it again" supplies all that is necessary for the threat element of the crime. (See People v. Hunt (1977) 72 Cal. App.3d 190, 199 [139 Cal. Rptr. 675].)
1 Witkin, California Crimes, Crimes Against the Person, section 289, at page 266, adequately expresses the law: "There need not be an actual application of force by the defendant; the victim does not consent `Where she is prevented from resisting by threats of great and immediate bodily *702 harm, accompanied by apparent power of execution.' [Citations.] [¶] The threat may be implied: `We are unable to agree with the view that there can be no threat within the meaning of this statute unless it is expressed in words or through the exhibition of a gun, knife or other deadly weapon. A threat may be expressed by acts and conduct as well as by words.' [Citation.]"
The sodomy and the oral copulation counts upon which defendants were convicted require that the acts be committed by one "who has compelled the participation of another person in an act of sodomy by force, violence, duress, menace, or threat of great bodily harm...." (Pen. Code, § 286, subd. (c); § 288a, subd. (c).)
Since we have concluded that "threats of great and immediate bodily harm" (Pen. Code, § 261, subd. 3) existed in the instant case, we are not called upon to analyze whether the word "compelled" as used in Penal Code section 288a, subdivision (c), and section 286, subdivision (c), is synonymous with "accompanied by apparent power of execution" as used in Penal Code section 261, subdivision 3. Nor do we hold that there is no substantial difference between the "threats of great and immediate bodily harm" as required in Penal Code section 261, subdivision 3 and "duress" and "menace" which, in addition to actual force and violence as well as the "threat of great bodily harm" is required in Penal Code section 286, subdivisions (a), (c). We merely note that the latter two sections (Pen. Code, §§ 286, subd. (c), 288a, subd. (a)) are decriminalized acts under circumstances qualified as consenting adults. We are not required here to define what is not consent but falls short of the elements necessitated under Penal Code section 286, subdivision (c), i.e., "duress," "menace," and the omission of the word "immediate."
Perhaps as a subpart of the insufficiency of evidence contention, appellants argue that the testimony of the victim was inherently improbable. We see no merit to this suggestion. It is unnecessary to restate the facts but appropriate to mention some added evidence produced by appellants. The defense admitted the victim was crying when they first met her and that she related a prior rape. The fact that she asked to be taken home is not challenged. The positioning of the persons in the car and the fact that the men walked on each side of the victim when they left the car at the park is established. The fact that the victim was crying and hysterical after the police came to the park is conceded.[8]
*703 While these facts do not of themselves establish the criminal acts, they are consistent with a reaction from such experience and therefore corroborate the evidence as given by the victim.
Under this set of circumstances, we see no improbability in the evidence supportive of the conviction. The case of People v. Headlee (1941) 18 Cal.2d 266 [115 P.2d 427] is not contra.
(2) Appellants also raise the issue of exclusion of relevant evidence. This excluded evidence was with regard to prior incidents of alleged rapes in which the present victim was violated.
Appellants were granted permission under Evidence Code section 782 to attack Miss K.'s credibility. Section 782 is the procedure involved in attacking credibility under section 780 of the Evidence Code.[9]
The trial court properly restricted cross-examination of Miss K. Evidence Code section 1103, subdivision (2)(a), excludes evidence of a victim's sexual conduct. (People v. Blackburn (1976) 56 Cal. App.3d 685, 690 [128 Cal. Rptr. 864].)[10] However, Evidence Code section 1103, subdivision (2)(a) does not bar evidence of sexual conduct to attack credibility. (People v. Blackburn, supra, 56 Cal. App.3d at p. 691.) Evidence Code section 780 permits the jury to consider certain matters in testing the credibility of the witness. "It does not require that any and all questions relative to credibility be allowed on cross examination.... Evidence Code section 780 was intended to continue the rule developed that the scope of the presentation of matters affecting credibility is in large measure within the discretion of the trial judge." (People v. Alfaro (1976) 61 Cal. App.3d 414, 423-424 [132 Cal. Rptr. 356].)
*704 When Penal Code section 261 is at issue, Evidence Code section 782 is the procedural means for testing the complaining witness's credibility under Evidence Code section 780 and is the companion amendment to Evidence Code section 1103, subdivision (2). (People v. Blackburn, supra, at p. 691.) Thus the discretion embodied in Evidence Code section 780 cannot be attacked unless there is an abuse of that discretion by the trial court.
In the instant case, the court admited evidence of the fact that Miss K. had been raped on previous occasions while hitchhiking. The questioning was restricted as to the exact circumstances of each rape, but such circumstances were not at issue in the instant case. The issue was whether she had or had not consented. Evidence that she had been raped on six other occasions bore on her credibility. The circumstances of the prior rapes were relevant on the nature of her sexual conduct and fell within the ambit of questions proscribed by Evidence Code section 1103, subdivision (2)(a).[11]
Before the jury, the victim was cross-examined about the prior rapes, but the examination substantially was limited to asking if she had consented to the intercourse. Permission was granted to cross-examine only if counsel could prove the instances were consensual and refused to "try all those cases." The court understood the purpose and intent of the cross-examination and exercised reasonable discretion. (Evid. Code, § 352); we find no error, particularly in light of Dr. Skrdla's testimony.
(3) As a related contention, there is claimed an unduly restricted examination of Dr. Skrdla which prejudiced the defense. Dr. Skrdla, the expert appointed to fulfill the needs of the Ballard v. Superior Court (1966) 64 Cal.2d 159 [49 Cal. Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416] motion, was thoroughly examined.[12] It was only where defense sought to *705 inquire into an unreported alleged rape by a minister in Oakland that the court exercised some restriction. The contention was that, being permitted, defense would establish that the victim believed herself to have been raped by the minister's use of witchcraft. The court refused to try the prior rapes and this was within the prerogative of Evidence Code section 352. It is contended that that was not the court's reason for exclusion of the evidence. Doctor Skrdla was appointed to examine the victim with an eye to detecting whether the victim was creditable or related a fantasy. Whatever Dr. Skrdla was told by the victim, he concluded that she was truthful. The effort to place before the jury her comment relative to the exercise by the minister of witchcraft would have tested the doctor's conclusion but would not have impeached the victim. While we believe the defense might have been given wider latitude of examination, the theory of attack presents such a remote impeachment that even if the case were deemed a close one, which we do not, the restriction would not require reversal even under the stringent Chapman v. State of California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] test. As the court clearly ruled, to try some six prior rape events would have persecuted the victim, proving beyond doubt that her desire not to be involved in court processes was preferable. Here there was but one charged act that was not admittedly done; it was only an issue of whether there was consent or not. The finding by the jury that all of the acts were committed, and the evidence substantiating that finding being without doubt establishes the jury's rejection of the credibility of defendants. We have heretofore analyzed the record supportive of the finding of the lack of consent.
The judgments are affirmed.
Hastings, J., concurred.
ASHBY, J.
I respectfully dissent.
This case does not involve some contrived technicality, it involves a matter of guilt or innocence. In my opinion, the evidence is not sufficient to establish compulsion by force or threat. Miss K.'s reaction to being raped earlier that morning before she met appellants very probably created an expectation in their minds that they could have sex with her. This expectation, however, does not establish the requisites of rape. It is a necessary element of the offenses of which appellants were convicted that *706 there be some resistance to overcome, whether it be overcome by force or threat. Resistance need not be substantial. A woman need not physically resist but she must at least manifest an unwillingness to engage in sex. (People v. Peckham, 232 Cal. App.2d 163, 167 [42 Cal. Rptr. 673]; People v. Newlan, 173 Cal. App.2d 579, 581 [343 P.2d 618].) At no time did Miss K. make any statement or engage in any conduct which indicated unwillingness or resistance of any kind. Furthermore, there was no evidence of force or threats of any kind which would excuse some expression of unwillingness. On the contrary, after Miss K. got into appellants' car, she told them the circumstances of the rape earlier that morning. The fact that she told them the circumstances of that rape made some manifestation of unwillingness on her part even more essential than in the ordinary case. The circumstances of the rape include her telling the rapist to pull over after he passed her offramp, attempting to jump from his speeding car when he refused to stop, and her repeatedly telling him, "Let me out of this car. I'll walk back." Appellants' expectations were no doubt reinforced when she did not tell King to pull over when he passed her offramp, did not try to leave the car or ask that King stop the car and let her out as they proceeded on to Holly Park. From appellants' point of view, Miss K.'s conduct with them would appear to be consent.
Her telling Loupe to get off her does not manifest the requisite unwillingness because that statement was made just before the sheriff's deputies arrived and after all the sex acts but the act in progress had already been completed. It is significant in two ways, however. One, it applied only to Loupe.[1] Two, it showed that Miss K. was capable of speaking up and expressing any unwillingness that she had.[2] There simply is no substantial evidence on which to base appellants' convictions.
A petition for a rehearing was denied July 6, 1979. Ashby, J., was of the opinion that the petition should be granted. Appellants' petitions for a hearing by the Supreme Court were denied August 22, 1979. Mosk, J., was of the opinion that the petitions should be granted.
NOTES
[1] Miss K. had hitchhiked to the service. She was among the last to leave the church. When she left, her plan was to get home by taking a bus, hitchhiking or walking. When she didn't see a bus, she began to walk. She knew it was over three miles from the church to her house. She saw the streets were deserted when she left the church. Miss K. testified that she lived with her father and mother, and that her father had a car and that he was at home that evening.
[2] Neither appellant was a policeman.
[3] When asked during the trial if she intended to tell the police about this rape, Miss K. testified, "No, because I didn't want to go through what I'm going through now."
[4] "Q. [Counsel for Plaintiff] Was there any conversation during this part of the drive, between any of you?

"A. He just kept on saying  you know  `You should tell the police.' And that `You shouldn't get in the car with strange people.'
"Q. Were you saying anything back to him?
"A. No, sir. Because I was still disgusted and vexed.
"Q. Were you still upset about the other incident that had happened that night?
"A. Yes, sir, very."
[5] At trial the prosecutor asked if the phrase had been stated in the same way as the victim related it on the stand; the response was in the affirmative. We reasonably conclude that the manner of recitation was as an order not a request.
[6] Deputy Schroeder testified that appellants made no effort to get away.
[7] Dr. Skrdla's evaluation was performed pursuant to a Ballard motion. (Ballard v. Superior Court (1966) 64 Cal.2d 159 [49 Cal. Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) He reviewed the transcript of the preliminary hearing and interviewed the victim for two and a half hours.
[8] We note that Dr. Skrdla concluded that the victim in his opinion, was telling the truth about the events of this occasion.

Dr. Skrdla performed a psychiatric evaluation of Miss K. and determined that she could distinguish truth from fantasy. However, he found that she was emotionally immature and tended to overreact in a histrionic fashion which manifested itself in seductive behavior. He found that she suffered guilt about sex. Skrdla's evaluation was based partially upon the history provided by Miss K. whereby she claimed she had been raped six times. One of these was by a minister in whose house she resided. She felt compelled by the circumstances of living there. Three of the other rapes occurred while hitchhiking. Skrdla considered this unusual.
[9] Evidence Code section 782 was found to be constitutional. (People v. Blackburn (1976) 56 Cal. App.3d 685, 691 [128 Cal. Rptr. 864].)
[10] "The relevance of past sexual conduct of the alleged victim of the rape with persons other than the defendant to the issue of her consent to a particular act of sexual intercourse with the defendant is slight at best." (People v. Blackburn, supra, at p. 690.)
[11] "Since the due process right to a fair trial does not require that all relevant evidence that may tend to exonerate a defendant be received and since the evidence barred by subdivision (2) of Evidence Code section 1103 is of limited probative value at best, subdivision (2) does not deprive the defendant charged with the crime of rape of a fair trial. Since subdivision (2) of Evidence Code section 1103 does not bar evidence of sexual conduct of the victim or her cross-examination concerning that conduct to attack her credibility, the right of confrontation encompassed in due process is not impinged." (People v. Blackburn, supra, 56 Cal. App.3d at p. 691.)
[12] "We recognize that psychiatric evaluation is not absolute but only relatively illuminating; its utility in the ascertainment of the prosecutrix' condition must depend upon its posture in the whole picture presented to the trial court. That court can properly determine in its discretion whether psychiatric testimony as to the mental and emotional condition of the complaining witness should be admitted." (Ballard v. Superior Court, supra, 64 Cal.2d 159, 174-175.)
[1] "Q. Now, up until that time, it's true, is it not, that you had not told either Mr. King or Mr. Loupe to stop what they were doing?

"A. [Miss K.] The only person I told to stop and to get off was Mr. Loupe. I didn't have to tell Mr. King that. Mr. King did what he had to do and he got off. Only Mr. Loupe, he got on and he stayed on."
[2] It should be noted that Miss K. was not reticent about expressing unwillingness during the earlier incident before she met appellants.