[Crim. No. 18747. First Dist., Div. One. Jan. 28, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFFORD ST. ANDREW, Defendant and Appellant.

452

**COUNSEL**

George T. Davis and Joseph C. Morehead for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Herbert F. Wilkinson, John T. Murphy and Ina Levin Gyemant, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GRODIN, J.**—Defendant Clifford St. Andrew appeals from a judgment of conviction entered on jury verdicts finding him guilty of rape by threat (Pen. Code, § 261, subd. 3) and forcible oral copulation (Pen. Code, § 288a). The issues on appeal can best be understood and evaluated against the background of the rather unusual circumstances in which the crimes are alleged to have been committed.

The defendant was a hospital attendant working the night shift in the psychiatric ward of a San Francisco hospital. The prosecutrix, Mrs. S., was a patient in that ward. According to her testimony, the defendant came to her on the night of April 22, 1978, and over a period of about two hours during which he went in and out of her room a number of times, he made increasingly aggressive sexual advances to her, culminating in acts of oral copulation and sexual intercourse.

According to Mrs. S., the defendant said nothing during this period except for an early remark that she had "good stomach muscles" and that he would return to give her a body rub. Mrs. S. said nothing at all, she voiced no protest and she did not resist. In connection with the oral copulation, she explained, "I was afraid he would strike me or I was afraid he would smother me." During the period after the oral copulation, in which defendant was assertedly out of the room for a short period, Mrs. S. said she considered yelling for help or trying to resist in some way but decided against doing so because she was afraid the defendant would have her "sheeted" and placed in a locked room alone with him. ("Sheeting" consists of wrapping a patient in sheets in order to restrain her. Mrs. S. had been "sheeted" a few days earlier, as a result of a psychotic episode, and defendant had participated in that process.) After the act of intercourse, according to Mrs. S., the defen-

dant said, "Now, this is confidential. This is just between you and me"; and she, still afraid, expressed agreement.

The defendant testified on his own behalf to the effect that his contact with Mrs. S. the night of April 22, 1978, was more or less routine. He denied any sexual contact with her. A pelvic examination of Mrs. S. disclosed no evidence of injury, nor of semen in her vaginal tract. A piece of Kleenex which Mrs. S. said she used to wipe herself with after the incident was found to contain semen containing secretions compatible with the blood and enzyme types of the defendant. They were also compatible with the blood and enzyme types of Mrs. S.'s husband, who visited her earlier that day. The defendant sought to convince the jury, and evidence was introduced both supporting and opposing that theory, that Mr. S. was responsible for the semen.

In addition to the offenses for which he was convicted, the defendant was initially charged by grand jury indictment with violating Penal Code section 261, subdivision 1, involving rape by means of intercourse with a person incapable of consent. After one day's deliberation the jury acquitted the defendant on that charge. After two additional days' deliberation the jury arrived at verdicts on the remaining two counts.

Defendant asserts a number of grounds for reversal. These include contentions (1) that the entire proceedings are void because the trial court failed to honor a peremptory challenge under Code of Civil Procedure section 170.6, or in the alternative that the failure of defendant's trial counsel to assert the challenge in proper form constituted denial of effective representation; (2) that the trial court abused its discretion in determining that the complaining witness was competent to testify; (3) that the trial court erroneously permitted the prosecution to introduce evidence of alleged prior misconduct on the part of defendant, and failed to instruct the jury as to the purpose for which such evidence could be considered; (4) that the trial court erred in refusing to give special instructions as requested by defendant, and in failing to provide a direct answer to a question by the jury with respect to the elements of the crime; (5) that the evidence fails to establish that the defendant threatened the prosecuting witness with great bodily harm; (6) that the grand jury indictment violated defendant's right to equal protection of the law; and (7) that the prosecution failed to present exculpatory evidence to the grand jury. We find merit in certain of these contentions, as discussed below, and, considering them in the aggregate, we conclude that we have no alternative but to reverse.

## I

■ Appellant argues that the entire proceedings were invalid because the trial court failed to grant his trial attorney's peremptory challenge of the trial judge under Code of Civil Procedure section 170.6. This argument is based on the fact that when first informed by the presiding judge of the judge to which the case was assigned for trial, defense counsel made an oral motion to disqualify that judge on the ground that he was "informed and believe[d]" that the assigned judge would be prejudiced against his client. When the presiding judge denied that motion without comment, defense counsel repeated the challenge in the language of the code section, prefacing his remarks with the statement, "I declare under penalty of perjury. . . ." Again, the presiding judge denied the motion and ignored counsel's request for a statement of the basis for the denial. The case was thereupon tried before the judge to whom objection had been made.

Recognizing that the challenge was formally defective because not supported "by affidavit or declaration under penalty of perjury or an *oral statement under oath*" (Code Civ. Proc., § 170.6, subd. (2)), appellant argues that the trial judge erred in denying the motion because there was "substantial compliance" with the statute, or in the alternative that failure of defendant's trial counsel to support the motion in proper form constituted a failure to act "in a manner to be expected of reasonably competent attorneys acting as diligent advocates," depriving defendant of his constitutional right to representation by effective counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859].) We find the first alternative contention to be without merit. The oath or verification requirement in section 170.6 is more than a "hollow formality"; it is an essential part of the statutory scheme of safeguards bearing upon the constitutionality of the disqualification statute. (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 197 [137 Cal.Rptr. 460, 561 P.2d 1148].) The denial per se was, therefore, not improper. ■ We do agree, however, that trial counsel should have been aware of the formal requirements, and that his failure to assert the motion in proper form constituted a departure from the standard of professional competency applicable under *Pope*. We have serious reservations also concerning the trial court's opaque silence in the face of defense counsel's obvious lack of awareness and request for explanation of the court's ruling. While it is not a judge's function to substitute for counsel in the trial of a case, the judge is "'not a mere umpire presiding

over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts.'" (*People* v. *Carlucci* (1979) 23 Cal.3d 249, 256 [152 Cal.Rptr. 439, 590 P.2d 15], quoting from *Estate of Dupont* (1943) 60 Cal.App.2d 276, 290 [140 P.2d 866].) Thus, it has been held that it is the duty of a trial judge to see that a case is not defeated by "mere inadvertence" (*Hellings* v. *Wright* (1916) 29 Cal.App. 649, 656 [156 P. 365]), or by "want of attention" (*Bare* v. *Parker* (1921) 51 Cal. App. 106, 108 [196 P. 280]), and "to call attention to omissions in the evidence or defects in the pleadings" which are likely to result in a decision other than on the merits. (*Farrar* v. *Farrar* (1919) 41 Cal.App. 452, 457 [182 P. 989]. See also *Miller* v. *Republic Grocery, Inc.* (1952) 110 Cal.App.2d 187, 192 [242 P.2d 396].) For a trial court to remain silent in the face of an obviously inept attempt on behalf of a criminal defendant to assert a right created by the Legislature, when a simple statement of the procedural requirement would presumably have cured the defect on the spot and without prejudice to the interests of any party, constitutes, under the circumstances of this case, an unwarranted abdication of the judicial role.

## II

When the prosecution first presented Mrs. S. as a witness at the trial, defendant's trial counsel objected on the ground that she was incompetent under Evidence Code sections 701[1] and 702.[2] After a hearing in chambers at which Mrs. S. and Dr. Kessler, a court-appointed psychiatrist, appeared and testified, the court overruled that objection. Appellant contends that the ruling constituted an abuse of discretion.

In *People* v. *McCaughan* (1957) 49 Cal.2d 409 [317 P.2d 974], the Supreme Court set forth certain principles applicable to the determina-

---

[1]Section 701: "A person is disqualified to be a witness if he is: [¶] (a) Incapable of expressing himself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (b) Incapable of understanding the duty of a witness to tell the truth."

[2]Section 702: "(a) Subject to Section 801, the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter. [¶] (b) A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony."

tion of competency of a witness suffering from mental derangement or defect. These principles include the following: (a) "The question to be determined is whether the proposed witness's mental derangement or defect is such that he was deprived of the ability to perceive the event about which he is to testify *or* is deprived of the ability to recollect and communicate with reference thereto" (*id.*, at p. 420, italics added); (b) "Whether he did perceive accurately, does recollect, and is communicating accurately and truthfully are questions of credibility to be resolved by the trier of fact" (*ibid.*); (c) "the competency of a witness is to be determined by the trial court in exercise of its judicial discretion" (*id.*, at p. 421); and (d) "sound discretion demands the exercise of great caution in qualifying as competent a witness who has a history of insane delusions relating to the very subject of inquiry in a case in which the question is not simply whether or not an act was done but, rather, the manner in which it was done and in which testimony as to details may mean the difference between conviction and acquittal" (*ibid.*). While *McCaughan* was decided on the basis of statutory language which has been superseded by Evidence Code sections 701 and 702, the revision does not appear to have affected these principles.[3]

On the basis of the evidence adduced at the in-chambers hearing, the question of competency was a close one. Dr. Kessler submitted a report in which he stated that during the period of the alleged offenses Mrs. S. was at times "grossly psychotic, with delusions, hallucinations, assaultive and violent behavior, and in addition, was felt to be angry and manipulative," and that "She has carried a fairly consistent diagnosis of schizophrenia with respect to her psychiatric condition and appeared to be grossly psychotic at the time of my interview of her." Asked whether she had "some incapacity to observe correctly or to remember correctly the events of that night," he answered, "I believe that is possible, yes."

---

[3]At the time *McCaughan* was decided, Code of Civil Procedure section 1880 provided for disqualification of persons "who are of unsound mind at the time of their production for examination...." That portion of section 1880 has been superseded by Evidence Code section 701 (see Law Revision Com. comment to former § 1880), and the new section requires the court to determine "only the prospective witness' capacity to communicate and his understanding of the duty to tell the truth" (Law Revision Com. comment to § 701). Section 702, however, renders the testimony of a witness concerning a particular matter inadmissible "unless he has personal knowledge of the matter," and this assumes "the capacity to perceive and to recollect." (Law Revision Com. comment to § 701.) Thus, an alleged incapacity to observe correctly or to remember correctly goes to the issue of personal knowledge under section 702. (See Jefferson, Cal. Evidence Benchbook (June 1978 supp.) § 26.2; cf. *People v. Eastmon* (1976) 61 Cal.App.3d 646 [132 Cal.Rptr. 510].)

By way of explanation, he testified that at times she would be in apparent touch with reality, but in his opinion her violence and hallucinating states were the "top of the iceberg." He was referring, by that testimony, to the fact that on April 18th, five days before the night in question, Mrs. S. learned that her grandfather had died and she became combative to the extent that she had to be put into a "sheet pack" and taken to a locked psychiatric unit. The following day she seemed improved, but the day after that she tried to jump out a window and was again put into sheet packings and placed in the locked unit. The next day, according to hospital records, she threatened to throw a chair at the window. In his opinion, it would be unlikely for her "to be so psychotic one day and then to have completely recovered from that condition the next day only on the third day to go back into psychosis again." In his own interview with her, she seemed rational at times, but then, when discussing her own father's death, she demonstrated a continuing belief that her father was still alive, and seemed to visualize her father's body, or casket, "right there in the office." In addition, during the interview, she heard the shattering of glass from a construction project next door; she reacted as if someone were accusing her of breaking the glass. While he was unable to express an opinion as to her state of mind during the precise period of the alleged rape (except on the basis of a hospital record to the effect that before the event she told a nurse that she had just seen someone jump out her window), he stated that "she was certainly capable of grossly distorting what was going on around here, and it would seem to me that she was capable of distorting in her mind what happened to her, capable of it on the basis of psychiatric history, symptomatology, all the things I have talked about."

This testimony certainly raised substantial question as to Mrs. S.'s competency to observe and relate the events which she allegedly witnessed. On the other hand, the hallucinations referred to by Dr. Kessler at that hearing did not include hallucinations "relating to the very subject of inquiry"[4] (*People* v. *McCaughan, supra*, 49 Cal.2d at p. 421), and deference to the trial court's determination might well be required if it were clear that the court were applying the correct legal standard. Unfortunately, this is not the case. At the very outset of the in-chambers hearing, after brief legal argument, but *before* any testimony,

---

[4] At trial, there was evidence that Mrs. S. believed she was being persecuted by persons engaged in the medical profession, that she felt threatened by hallucinations of persons coming into her room to get her, and that she believed she had been sexually molested by a hospital employee when she was seven years old. This evidence was not before the court at the time it made its ruling on competency, however.

the court announced, "I am denying your motion to prevent the... woman from testifying. However, I will conduct a voir dire here in chambers outside the presence of the jury to see if she understands the nature, that is, the oath, and if she is called upon to tell the truth, and so forth." The court asked no questions of Dr. Kessler. After Dr. Kessler testified, the court questioned Mrs. S. solely as to whether she understood the difference between truth and falsehood and the meaning of the oath. He made clear that so far as he was concerned he was not dealing with Evidence Code section 702, and that the prosecutrix had a "Constitutional Right to appear before this jury." In addition, he refused to permit defense counsel to ask Mrs. S. any questions whatsoever. These rulings and comments raise serious doubt as to whether the trial court exercised its discretion on the basis of applicable legal standards. Moreover, the court's total refusal to allow cross-examination of Mrs. S. on the question of her competency raises serious questions of procedural fairness. (Cf. *Jenkins* v. *Jenkins* (1954) 125 Cal.App.2d 109, 113 [269 P.2d 908]; *People* v. *Murray* (1970) 11 Cal. App.3d 880, 886 [90 Cal.Rptr. 84]; Cal. Const., art. I, § 15; Evid. Code, § 711.)

## III

 Appellant asserts as error the admission of certain testimony. During cross-examination of the defendant, the prosecutor was allowed to ask whether the defendant had ever kissed or attempted to kiss a female patient, and the defendant responded in the negative. Defendant objected to the line of interrogation which preceded these questions, and during an in-chambers conference the prosecutor indicated that he intended to produce as a witness a former patient who would testify that the defendant had, indeed, kissed her on one occasion and attempted to kiss her on another. When defense counsel objected that this evidence would be inadmissible, the prosecutor argued that it was relevant to show a "continuing plan to use the psychiatric patients for sexual gratification, for sexual favors"; and the court indicated it would allow the questions on that theory.

On rebuttal the prosecutor produced a witness who was allowed to testify, again over objection, that she had been a patient on the same ward as the prosecutrix for three weeks in July 1977 and again for approximately three weeks in September 1977 and that during one of those periods (she could not remember which) the defendant, whose practice it was to wake her in the morning, woke her with a kiss. She

did not remember whether the kiss was on the face or on the mouth. She reported the incident to her psychiatrist. She testified also that on another occasion (again, she could not remember during which period) she was in the washroom when the defendant "came over to me and just wanted to kiss me," putting his hand on her arm, and she pushed him away. Again, she reported the incident to her psychiatrist.

This evidence was received without benefit of any limiting instruction as to its relevance. (Cf. *People* v. *Williams* (1970) 11 Cal.App.3d 970, 978 [90 Cal.Rptr. 292].) In his closing argument to the jury, the prosecutor made repeated reference to the evidence as "suggest[ing] something about [defendant's] character, his motive, and the other issues in this case," as demonstrating that the defendant had an "unnatural sex interest" in the patients on the floor, as lending credibility to the testimony of the prosecutrix, and as demonstrating that the defendant was not a reliable witness.

■ A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be thereafter contradicted. (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77]; *Rousseau* v. *West Coast House Movers* (1967) 256 Cal. App.2d 878, 887-888 [64 Cal.Rptr. 655]; *Garcia* v. *Hoffman* (1963) 212 Cal.App.2d 530, 536-537 [28 Cal.Rptr. 98].) This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions. (*People* v. *Lavergne, supra*, at p. 744. See also *People* v. *Benjamin* (1974) 40 Cal.App.3d 1035, 1042 [115 Cal.Rptr. 668].) Thus, if proof that the defendant had kissed a patient in the past would not be independently admissible, it may not be used for the purpose of impeaching the defendant's testimony elicited on cross-examination. (See Jefferson, Cal. Evidence Benchbook (1972) § 27.18.) Nor is such evidence admissible to show a trait of character to attack the defendant's credibility. (Evid. Code, § 787; *People* v. *Thompson* (1979) 98 Cal.App.3d 467, 477 [159 Cal.Rptr. 615]. Cf. *People* v. *Wall* (1979) 95 Cal.App.3d 978, 989 [157 Cal.Rptr. 587] (relying on Evid. Code, § 1103, subd. (1) to support admissibility of evidence of specific instances of conduct on the part of a victim-witness).)

■ The evidence in question was arguably relevant to show that the defendant had a propensity to use female patients for his sexual gratification, as the prosecutor contended, but for that purpose it was

clearly inadmissible. Evidence Code section 1101, subdivision (a) provides (insofar as it is relevant here) that evidence of a person's character or character trait in the form of evidence of specific instances of his conduct is inadmissible when offered to prove his conduct on a specified occasion. "Section 1101 is concerned with evidence of a person's character (i.e., his propensity or disposition to engage in a certain type of conduct) that is offered as a basis for an inference that he behaved in conformity with that character on a particular occasion." (Law Revision Com. comment to § 1101.) Referring to the principle of exclusion as it applies to prior criminal conduct, the Supreme Court has declared that the rule has three purposes: "(1) to avoid placing the accused in a position in which he must defend against uncharged offenses, (2) to guard against the probability that evidence of such uncharged acts would prejudice defendant in the minds of the jurors, and (3) to promote judicial efficiency by restricting proof of extraneous crimes." (*People v. Thomas* (1978) 20 Cal.3d 457, 464 [143 Cal.Rptr. 215, 573 P.2d 433].)

"'[A] defendant is not to be convicted because the prosecution can prove, on his prior (or subsequent) record, that he is a bad man.'" (*People v. Thomas, supra*, 20 Cal.3d at p. 464, quoting from *People v. Adamson* (1964) 225 Cal.App.2d 74, 79 [36 Cal.Rptr. 894].) The same policy considerations appear to apply where the prior conduct, though not criminal, would be considered reprehensible by the jury; and in any event section 1101, subdivision (a) makes no distinction between criminal and noncriminal conduct. Thus, the evidence was legally inadmissible for the purpose of proving that the defendant had a "disposition" or "propensity" to engage in the type of conduct of which he was accused. (See *People v. Thompson, supra*, 98 Cal.App.3d 467.)

The prohibition of section 1101 does not apply where the evidence of prior acts is relevant to prove some fact other than the person's disposition to commit such acts, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Evid. Code, § 1101, subd. (b).) And the Supreme Court has declared that an exception to the general rule exists where there is evidence of a "common design or plan," consisting of the defendant's "modus operandi or distinctive, characteristic method of committing crimes," or of "'"a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a part."'" (*People v. Thomas, supra*, 20 Cal.3d at pp. 464-465.) "Ordinarily," *Thomas* teaches, "evidence of

a common design or plan would bear either on the issue of the defendant's *identity* as the perpetrator of the charged offense, or the defendant's *intent* to commit that offense," though in view of the language of section 1101, subdivision (b) "there may be additional applications of the exception" as well. (*Id.*, at p. 465.)

■ The People contend that evidence of defendant's prior misconduct was properly admitted to show "common modus operandi bearing on the issue of his identity." This contention, which is advanced for the first time on appeal, is without merit. This is not a situation in which there is a "primary issue of fact [as to] whether or not defendant rather than some other person was the perpetrator of the crime charged." (Cf. *People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91].) In any event, evidence of prior misconduct to show identity can be introduced only where there are "common marks having some degree of distinctiveness," creating an inference of identity; and the strength of the inference in any case "depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks." (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267]. See also *People* v. *Alvarez* (1975) 44 Cal.App.3d 375 [118 Cal.Rptr. 602].) The facts of this case do not even begin to meet these criteria. Thus, if it were established that someone forced the victim to sexual intercourse and oral copulation and the question were who did it, the fact that defendant may have kissed and attempted to kiss a female patient 7 or 10 months prior to the incident hardly bears "common marks" of such distinctiveness as to give rise to a strong inference that it was defendant rather than someone else.

We do not read *Thomas* as diluting the "common marks" requirement where prior conduct is relied upon to establish identity, nor do we read that case as creating an open door to evidence based on "common design or plan" in the abstract, independent of some evidentiary purpose other than a demonstration of proclivity or character. Otherwise, the exception would swallow the rule. (6) Whatever its scope of application, however, the "common design or plan" exception to the general rule has no application here. To be admissible under that exception, the prior offenses must be (1) "not too remote in time, (2)...similar to the offense charged, and (3)...committed upon persons similar to the prosecuting witness." (*People* v. *Thomas, supra,* 20 Cal.3d at p. 465.) Moreover, "the test of admissibility...is 'whether there is some clear

connection between that [prior] offense and the one charged so that it may be *logically inferred that if defendant is guilty of one he must be guilty of the other.* Or as the matter is sometimes stated, the other offenses...are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they *warrant the inference that if the defendant committed the other acts he committed the act charged.* [Citations.]'" (*Ibid.*, italics added.) While the object of the defendant's prior alleged acts was "similar to the prosecuting witness," it cannot reasonably be said that the acts were so related in time and so similar in nature as to warrant the inference that if the defendant was guilty of the kissing he was also guilty of the forcible oral copulation and rape.

■ The People argue also, again for the first time on appeal, that the evidence in dispute demonstrated a modus operandi tending to corroborate the testimony of the prosecuting witness. It is difficult to understand in what way the evidence could be admissible for that purpose without violating the proscription of section 1101, subdivision (a), since it would only tend to corroborate the testimony of the prosecuting witness insofar as it tended to show that the defendant in fact committed the acts to which she testified. (See *People* v. *Thompson, supra,* 98 Cal.App.3d 467, 475.) Moreover, the admissibility of character trait evidence on the issue of credibility of a witness is governed by Evidence Code sections 786 to 790, and nothing in those sections appears to support its admissibility under the circumstances present here. (*Ibid.*) In any event, as Justice Jefferson notes in *Thompson,* "for sex cases, *Thomas* rejects completely the theory that...the testimony of a witness similar to the victim that prior criminal acts with that person were committed by the defendant, is *independently* admissible to *corroborate* the victim's testimony as a witness regarding the crime charged against defendant." (*Id.*, at pp. 479-480. Cf. *People* v. *Goodson* (1978) 80 Cal.App.3d 290, 295 [145 Cal.Rptr. 489] (holding that evidence admissible on the basis of a common design or plan may be used, in part, to corroborate the victim's testimony).) Here, as we have observed, there is no adequate showing of "common design or plan," nor other adequate showing of proximity in time and similarity of offense, as might support introduction of the evidence for the purpose of corroboration.

We conclude that admission of this evidence was error, and that the resulting prejudice to the defendant was compounded both by the absence of any limiting instruction and by prosecutorial argument which

invited the jury to consider the evidence for clearly impermissible purposes. The case is a close one, turning primarily upon the respective credibility of the two principal witnesses. In such a case, "'any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.'" (*People v. Gonzales* (1967) 66 Cal.2d 482, 494 [58 Cal.Rptr. 361, 426 P.2d 929]; *People v. Briggs* (1962) 58 Cal.2d 385, 407 [24 Cal.Rptr. 417, 374 P.2d 257]; *People v. Reeder* (1976) 65 Cal.App.3d 235, 244 [135 Cal.Rptr. 421] (conc. op. by Friedman, J.).) The fairness of the trial was also tainted by the procedural infirmities discussed in parts I and II of this opinion. We are well aware of the obstacles which a prosecutor typically confronts in obtaining a conviction for rape (see *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 879-882 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]), and of the difficulties inherent in retrial of a case of this sort. We are forced to conclude, however, that the errors to which we have adverted were prejudicial in the sense that they caused a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution, and that the conviction must be reversed. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Having reached this conclusion, it is unnecessary to consider the remaining contentions of the defendant. Since the case must be retried, however, it is appropriate to comment upon certain issues which may reoccur.

In our view defendant is correct in contending that the jury in a case such as this should be provided with instructions more particularized than those contained in CALJIC. As regards the definition of "threats" for purposes of Penal Code section 261, subdivision 3, it is of course well established that they need not be expressed by words, that they may be inferred from conduct as well. (E.g., *People v. Flores* (1944) 62 Cal.App.2d 700, 703 [145 P.2d 318]; *People v. Winters* (1958) 163 Cal.App.2d 619, 623 [329 P.2d 743]; *People v. Hunt* (1977) 72 Cal.App.3d 190, 194 [139 Cal.Rptr. 675]; *People v. King* (1979) 94 Cal.App.3d 696, 701 [156 Cal.Rptr. 268].) In the typical case, however, the implication of threat is fairly clear, based upon normal response to overt conduct. "If one were met in a lonely place by four big men and told to hold up his hands or to do anything else, he would be doing the reasonable thing if he obeyed, even if they did not say what they would do to him if he refused." (*People v. Flores, supra*, at p. 703.) The language in *People v. Hunt, supra*, to the effect that the

woman's fear must have a "reasonable basis in the overt actions of the alleged rapist" (*id.*, at p. 200), is presumably premised upon that typical situation. This is an atypical situation, involving uncommunicated fears which were possibly not "reasonable" when tested by normal standards. Mrs. S.'s belief that the defendant could by his own instructions have her sheeted, or that he would strike or strangle her if she resisted, arguably had no basis in fact. Nevertheless, "'One who takes advantage of a victim's unreasonable fears of violence should not escape punishment any more than the swindler who cheats gullible people by false statements which they should have found incredible....'" (Commentary to Kentucky Pen. Code, quoted in *Salsman* v. *Com.* (Ky.App. 1978) 565 S.W.2d 638, 641.) Within the confines of a mental ward, unreasonable fear on the part of patients is likely to be the norm, and their attendants are presumably aware of that general state of affairs.

■ If a hospital attendant takes advantage of his relationship with a female mental patient to have sexual intercourse with her under circumstances in which he *knows* that she views his conduct as implying threat of great and immediate bodily harm accompanied by apparent power of execution, and she submits without resistance on that account, he is guilty of the crime of rape even though her view of his conduct may be "unreasonable" in terms of general standards. Of course, his knowledge may be inferred from all the circumstances of the case. (Cf. *People* v. *Norrington* (1921) 55 Cal.App. 103, 109 [202 P. 932].)[5] The jury should be instructed in accordance with the foregoing, and its attention should also be called to the requirement that the threats be of "great and immediate bodily harm."[6]

Reversed.

Racanelli, P. J., concurred.

---

[5]The situation presented by the facts of this case is different from one in which the defendant admits intercourse with the prosecuting witness but claims as a defense that he believed honestly and reasonably that the prosecutrix voluntarily consented to engage in sexual intercourse. (Cf. *People* v. *Mayberry* (1975) 15 Cal.3d 143, 155 [125 Cal.Rptr. 745, 542 P.2d 1337]; *Reg.* v. *Morgan* (1976) A.C. 182; *United States* v. *Short* (1954) 4 U.S.C.M.A. 437, 16 C.M.R. 11.)

[6]The fact that "sheeting" of a mental patient may under certain circumstances constitute an appropriate medical procedure does not eliminate it from the category of relevant statutory "harm"; presumably a surgeon who threatened to cut out a patient's gall bladder if she did not have sexual intercourse with him would be guilty of rape. But the rape statute requires that the harm be "bodily," "great," and "immediate." Thus, emotional or mental harm would not appear to suffice. In *People* v. *Tanner* (1935) 3 Cal.2d 279, 297 [44 P.2d 324], the Supreme Court characterized the binding of a person with ropes and wire as constituting "bodily harm" within the meaning of a kidnaping statute which called for a greater penalty in cases in which the victim suf-

NEWSOM, J.—After the same searching and troubled consideration given this case by my colleagues, I concur in the judgment and in the reasoning which supports it, except that I do not endorse the majority's implication that the trial court had a duty to advise counsel of the proper means of invoking Code of Civil Procedure section 170.6.

I may add that I do not see in what way Code of Civil Procedure section 170.6 involves, or affects, the interests of justice.

A petition for a rehearing was denied February 27, 1980, and respondent's petition for a hearing by the Supreme Court was denied March 27, 1980.

---

fered bodily harm. In *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], the Supreme Court opined that "by defining rape in categories in which one category is accomplished by the use of force or violence, and a second category is accomplished by the use of 'threats of great and immediate bodily harm,' the Legislature indicated an intent that rape by force or violence was *not* synonomous with rape by means of great and immediate bodily harm," and that the latter was intended to be "something more than, and different from" the former. (*Id.*, at p. 583.) The court suggested a similar analysis is applicable to Penal Code section 288a. (*Id.*, at p. 584.) Assuming without deciding that a jury could find a threat of sheeting to satisfy the statutory requirements in a particular case, its attention should at least be drawn to the issues involved.