Filed 7/26/21  In re J.B. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | H047828<br>(Santa Clara County<br>Super. Ct. No. 19JV43678A) |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>      Defendant and Appellant. | |

J.B. appeals from the juvenile court's disposition order placing him on probation after he was found to have committed one count of rape by force or violence (Pen. Code, § 261, subd. (a)(2))[1] and two counts of oral copulation by force, violence, duress, menace, or fear (§ 287, subd. (c)(2)(A)).  On appeal, J.B. argues that the juvenile court abused its discretion when it admitted hearsay statements made by the victim to her mother, the juvenile court imposed unlawful probation conditions, and the five-year restraining order issued in this case exceeded the maximum duration permitted under the law.  As we explain, we modify the juvenile court's disposition order by striking one of the challenged probation conditions.  As modified, we affirm the disposition order.

---

[1] Unspecified statutory references are to the Penal Code.

# I. BACKGROUND

## A. *The Petition*

On May 1, 2019, the Santa Clara County District Attorney's office filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging that J.B. came within the juvenile court's jurisdiction for committing a count of rape by force or violence (§ 261, subd. (a)(2); count 1) and two counts of oral copulation by force, violence, duress, menace, or fear (§ 287, subd. (c)(2)(A); counts 2 & 3).

## B. *The Jurisdictional Hearing*

### 1. *The Prosecution Case*

#### a. *Victim's Testimony*

Victim and J.B. were both high school students at the time the offenses were committed. Victim and J.B. had dated between August and December 2018.

At around 8:00 p.m. on February 5, 2019, victim went with her mother (mother) and grandmother to pick up her brother from a high school basketball game. After arriving at the school, victim sent J.B. a text message and asked him to take her to the gym because she did not know her way around the school. J.B. agreed, and victim went alone with him to the gym to find her brother. When they arrived at the gym, J.B. went inside to get victim's brother, but victim's brother said that he wanted to stay at the game a while longer. J.B. told victim that he wanted to stay with her until her brother was ready to leave, and the two sat down at a bench near the campus's quad area. Eventually, J.B. and victim shared a consensual kiss.

Afterwards, J.B. stood up and told victim to go with him to the football field. As they were walking near the volleyball court, J.B. stopped and said that he wanted to be alone. J.B. hugged victim, and victim pulled away and asked J.B. why he wanted to stop " 'all the way over here.' "

J.B. then grabbed victim's buttocks. Victim pulled back, but J.B. pulled victim closer and grabbed her breasts and her buttocks. Victim stepped back and said, " 'I don't want to do this.' " J.B. responded, " 'Let's do something sexy.' "

Victim became scared because it was dark, she was alone with J.B., and she was not sure where her mother was. Victim replied, " 'No, I don't want to.' " J.B. said, " 'Come on, just for a little bit,' " and pointed to a bench across the volleyball court. J.B. took victim's hand and walked toward the bench. Victim did not resist, but she walked slowly behind him.

Victim and J.B. sat down on the bench, and J.B. placed victim's hand on his erect penis. Victim took her hand away. J.B. then pulled his pants down to his knees, placed victim's hand on his penis, and had her masturbate him with his hand over hers. J.B. had a tight grip over victim's hand, and victim took her hand off J.B.'s penis after he let go. J.B. then put his hand on the back of victim's neck and pushed her down over his lap. Victim resisted and pushed up while J.B. pushed down. Victim did not say anything, but J.B. said, " 'Come on, just for a little.' " Victim did not want to do anything, but J.B. held her neck, so she orally copulated him for a few seconds until he took his hand away.

J.B. pulled his pants up and said, " 'Come over here.' " J.B. took victim's hand and led her behind the bleachers. Victim was afraid, but she did not resist. Victim explained that J.B. had already placed his "arms over [her] head," and he was a lot stronger than victim. Victim and J.B. went behind the bleachers, and J.B. pulled down both his pants and victim's pants. As J.B. pulled down her pants, victim said " 'no' " and " 'I don't want to do this.' " J.B. continued to repeat, " 'Only for a little bit.' " J.B. went on his knees and orally copulated victim. Victim pulled back a little, but she did not otherwise resist. Victim was afraid because she was not sure what J.B. would do if she did not cooperate.

Victim pulled J.B. by his hair and stepped away from him. Victim and J.B. did not say anything to each other. J.B. stood up, turned victim around, held onto victim's hips, and penetrated her vagina with his penis from behind. Victim did not say anything to J.B., but she felt like she was going to throw up. J.B. let victim go after less than a minute, and victim was able to stand up and pull her pants up. At that time, J.B. had not ejaculated yet. Victim turned around and told J.B., " 'I don't feel good.' " J.B. responded, " 'Can I just finish?' " Victim replied no and started to walk away.

J.B. followed victim and said, " 'I'm sorry.' " Victim continued walking, and J.B. said, " 'I'm sorry. Hold on so we can talk.' " Victim felt overwhelmed and afraid. J.B. also said, " 'I'm sorry. That was wrong.' " J.B. seemed nervous.

Victim reached the parking lot and went inside of her mother's car. J.B. did not say anything as victim went inside the car. Mother was already inside the car, and victim asked her for a mint. Victim did not tell mother about what had happened because she was in shock. J.B. went and got victim's brother and brought him over to mother's car. After J.B. came back, he waved goodbye to victim and her family.

A few days later, victim told mother about what had happened with J.B.[2] Victim told mother that there was something that she needed to tell her, and victim told mother that J.B. had raped her. Victim did not report the incident to the police at the time because she was afraid of the reporting process and was not sure if she wanted to go through it.

---

[2] During her direct examination, victim said she told her mother about what had happened approximately two weeks after the incident. On cross-examination, victim said that she had the conversation with her mother approximately four or five days after the incident.

After she was assaulted, victim was affected at school and had difficulty focusing. She spoke to her school counselor in April about what had happened with J.B. The school counselor reported the assaults to the police.

Victim and J.B. spoke to each other over FaceTime one time after the incident at the school. On April 1, approximately two months after the incident, victim exchanged messages with J.B. over Instagram.[3] Victim was alone when she sent J.B. the messages. J.B. contacted victim first and asked her why she "un-add[ed]" him from her Instagram account. During the conversation, victim repeated that she had told J.B. no, and J.B. denied that the sex was nonconsensual.

By the time victim exchanged messages with J.B. over Instagram, she had already told her current boyfriend about what had happened. Her boyfriend had been unhappy after he learned about the incident at the school, and he wanted to know why victim did not fight back more during the assault.

b. ***Mother's Testimony***

On February 9, 2019, victim disclosed to mother that J.B. had raped her. Victim made her disclosure after her boyfriend told mother that victim had something that she wanted to tell her. Mother went into victim's bedroom and saw victim curled up in a ball. Victim and mother spoke for approximately half an hour.

Approximately two months later, mother was interviewed by the police. Mother told the officer that to the best of her knowledge, victim told her the truth about what had happened with J.B. At the time, mother said that victim had told her that at one point during the assault, victim went down on her knees to throw up and J.B. "tried to stick his dick in her mouth too."

---

[3] A copy of the Instagram messages was admitted into evidence.

After mother spoke with the officer, she had numerous other conversations with victim. Approximately a month later, she had a "clarification" with victim, and mother now believed that when victim bent over and was on her knees, J.B. attempted to put his penis inside victim's vagina again. Mother testified that victim told her that after J.B. forced himself on her, she got away from him and felt that she was going to be sick, and J.B. tried to have sex with her again. According to mother, "[victim] said that [J.B.] forced himself on her and she he [*sic*] said it lasted about a minute or—got away from him and then she was going to get sick. She didn't throw up, but she was nauseous and that's when he tried to have sex with her again."

Victim showed mother some of the text messages that she exchanged with J.B. Mother did not help victim create the messages, and victim told mother she was alone when she sent the messages to J.B.

### c. *Detective Beth Stenger's Testimony and J.B.'s Interview*

San Jose Police Department Detective Beth Stenger was assigned to investigate victim's complaint on April 1, 2019. Detective Stenger interviewed J.B. at his high school on April 29, 2019.

During the interview, J.B. told Detective Stenger that he was at a basketball game at his high school on February 5, 2019, and he met with victim after she sent him a text message. J.B. said that he and victim had kissed and had done " 'other stuff' " including " '[a] blow job, sexual intercourse, my dick in her pussy.' " J.B. said that he and victim had sex on the volleyball court at the high school.

Detective Stenger told J.B. that there were surveillance cameras on campus.[4] J.B. said he did not realize that there were surveillance cameras, and he was " 'sorry.' "

---

[4] Detective Stenger clarified that the high school dean told her that there were cameras in the field but not in the volleyball court area.

J.B. explained that he had not meant any harm, and he had kissed victim and she had kissed him back. Detective Stenger told J.B. that victim had reported that she had told J.B. no, and J.B. responded that he did not hear her say no. J.B. said that this was the first time that he had sex with victim, and they had missed each other. J.B. said that he and victim were just "kids in high school." J.B. also said that he understood that if someone was physically resisting and pulling away, that meant "no." He further said that he did not want the incident with victim to define him. J.B. said he felt bad after what had happened. Detective Stenger asked J.B. if he wanted to write an apology letter, and J.B. answered yes.

At one point during her interview with J.B., Detective Stenger told J.B. that she did not want to hear him say that the sex was consensual anymore, and she told J.B., " 'You can be truthful with me or you can continue to feed me with the crap that I'm hearing.' "

A transcript and a recording of J.B.'s interview with Detective Stenger was admitted into evidence. The transcript reflects that after J.B. wrote the apology letter, he apologized to Detective Stenger by saying, "Once again, I'm sorry for um, lying, I [*sic*] this is very surreal." J.B. also said, "I'm [pause] so disgusted with myself. And the people are around [*sic*] me will be disgusted at me, too and I am, I, I want to do everything that I can [¶] . . . [¶] to show that, [pause] this will never happen again." J.B. asked Detective Stenger, "Am I gonna be a registered sex offender?"

d. *The Instagram Messages*

A copy of the messages that victim and J.B. exchanged over Instagram was admitted into evidence. In her messages, victim reiterated multiple times that she had told J.B. "no," but J.B. denied that the sex was nonconsensual. J.B., however, apologized and said he was "sorry for what [he] did." J.B. replied that victim had said "no after a long time," he did not remember that victim said "no," and if victim did say "no," then he

7

"should have stopped for sure." J.B. also said he did not hear victim say no. He also wrote, "It was once u pulled everything up that I realized it ok I'm so sorry." Victim wrote that the kiss that they shared was consensual but everything else after that was "forced under peer pressure." J.B. also responded, "I missed u that night and it wasn't me u were with . . . it won't happen again my mother didn't raise me like that . . . a monster who took advantage . . . it will never happen again."

### e. *The Apology Letter*

The apology letter that J.B. wrote in front of Detective Stenger was admitted into evidence. In the letter, J.B. wrote: "I am sorry for everything I have done to you," and "I was not in my right mind when I did this to you and I feel ashamed, disgusted, and terrible for what I have done." J.B. also wrote, "I was missing you a lot since we were apart and that night and I let my emotions and what I was feeling take over." J.B. further wrote that he was sorry for "[b]eing an absolute idiot and using you like you weren't a human being too."

## 2. *The Defense Case*

### a. *J.B.'s Testimony*

On February 5, 2019, J.B. was at his high school at a basketball game when he received a text message from victim at around 7:30 p.m. Victim asked J.B. if he could go find victim's brother, who was also at the basketball game. When victim arrived at the school, she met with J.B. and they hugged.

J.B. and victim sat down on a bench and started to talk. Eventually, the two shared a consensual kiss. Victim had her arm around J.B.'s waist. Victim and J.B. walked over to the gym to see if victim's brother was watching the basketball game. J.B. went inside and found victim's brother, but victim's brother said he did not want to leave and wanted to wait until the game ended.

J.B. and victim walked on the campus while holding hands. They stopped walking and kissed again near the school's volleyball court. J.B. grabbed victim's buttocks but only after they were already "making out." J.B. and victim moved toward the benches in the area. J.B. did not hold victim's hands, and victim did not express any reservations or resist in any way.

J.B. and victim sat down on the bleachers. J.B. pulled his penis out, and he motioned for victim to orally copulate him, and she willingly did so. J.B. rubbed victim's back, but he never touched victim's head. The oral copulation lasted around 30 seconds. Afterwards, victim put her hand on J.B.'s penis. J.B. stood up and motioned for victim to follow him behind the bleachers. Victim did not say anything. Victim started to pull her pants down, so J.B. got down on his knees, finished pulling victim's pants down, and orally copulated her. Victim did not say anything that would lead J.B. to believe that she thought that they were doing anything inappropriate. J.B. asked victim if she liked what he was doing, and she responded, " 'Yeah, this is—this feels good.' " Victim then turned around and bent over with her hands on her knees, and J.B. had sex with her.

After about a minute, victim stood up, pulled her pants up, and said, " 'I'm done, I'm cold, and I think the game is over, we need to go.' " J.B. was shocked and thought that he had hurt her in some way. Victim quickly walked away, and J.B. caught up to her and asked her if she enjoyed what he had did, if he had hurt her, and what she was feeling. Victim reiterated that she thought it was cold and that the basketball game was over. Victim and J.B. walked back to the gym area while holding hands, and they kissed a final time before victim left and walked toward mother's car. Victim told J.B. that they should stop holding hands because she did not want mother to think that they were dating again. J.B. told mother that he would go get victim's brother, and J.B. brought victim's brother over to the car.

9

After the incident, J.B. received "streaks" on Snapchat from victim, which meant that they exchanged pictures on daily basis. J.B. said that the Snapchat streak started from February 6, 2019, the day after the incident, and lasted several weeks. Victim also "liked" several Instagram posts that included videos of J.B.

Several months after the incident, J.B. and victim exchanged messages over Instagram. J.B. was confused about why victim said that she did not feel comfortable about him because they had just had a "totally fine conversation" over FaceTime. J.B. told victim that she should not lie about what had happened. J.B., however, apologized to victim because what had happened was "spur of the moment" and they "both felt weird after it." J.B. also testified that he apologized because he wanted to tell victim what he thought that she wanted to hear.

J.B. was later interviewed by police at his high school. During the interview, J.B. said that the sex was consensual and that he did not use force with victim. J.B. thought that the detective who spoke to him was aggressive, and he immediately felt that the detective was upset with him. J.B. was afraid because he was trying to tell the truth, but the detective yelled at him and was not believing what he said. When the detective asked J.B. to write an apology letter, he agreed because he thought it would stop "whatever next was coming from happening" and he wanted to get out of the room. J.B. broke down crying during the interview several times.

C. *The Jurisdictional Finding and Disposition*

On October 21, 2019, the juvenile court issued a written order sustaining all three of the counts alleged in the juvenile wardship petition. The juvenile court concluded: " 'This was not a cover up. The initial hello kiss was consensual, after that, this is a case of a young man who took advantage of a young woman on a cold February night at a remote location on a high school campus while her mother and grandmother sat in the car waiting for her return after she was sent to retrieve her brother at a basketball game."

10

On December 20, 2019, the juvenile court issued a permanent five-year restraining order that expires on December 20, 2024.

On January 17, 2020, the juvenile court declared J.B. a ward of the court and placed him on probation subject to various probation conditions.

## II. DISCUSSION

### A. *Hearsay Testimony*

On appeal, J.B. argues that the juvenile court abused its discretion in admitting victim's hearsay statements to her mother about what happened between her and J.B. J.B. claims that the juvenile court correctly admitted victim's first statement to her mother on February 9 that J.B. had tried to put his penis in her mouth as victim's prior inconsistent statement under Evidence Code section 1235. J.B., however, maintains that the juvenile court erred in admitting victim's subsequent clarifying statement to her mother that J.B. tried to have sex with her again. J.B. argues that victim's clarifying statement was inadmissible hearsay, and the admission of the statement was prejudicial error because the evidence corrected a material inconsistency and bolstered victim's credibility.

### 1. *Background*

Mother testified out of order before victim so she could stay with victim as her support person when victim testified. J.B.'s defense counsel questioned mother before the prosecutor and asked mother about a conversation that she had with victim about what had happened with J.B. on February 9, 2019, approximately four days after the incident. Approximately two months later, mother was interviewed by the police, and mother told the officer that victim had said that at one point during the assault, victim went down on her knees to throw up, and J.B. "tried to stick his dick in her mouth too."

The prosecutor then questioned mother about the conversation that she had with victim about the incident on February 9. Defense counsel objected, arguing that unless

11

the statements were coming in as a fresh complaint, he believed that victim's prior statements were inadmissible hearsay. The prosecutor argued that he believed that defense counsel had elicited mother's testimony about what victim had said about the assault "under the theory of a potential prior inconsistent statement," and he was "just trying to establish a prior consistent statement." The juvenile court decided, "I'm going to allow the testimony and it will be subject to being struck if, [defense counsel], you can persuade me that it has no relevance or it's somehow not admissible under a theory, some sort of theory."

Subsequently, the prosecutor continued questioning mother about her recollection of the conversation that she had with victim about the incident on February 9, 2019. Mother said, "When [victim] finally got [J.B.] to stop, put himself in her, she got him off of her, she said she was going to throw up so she went over and—I got corrected. Before, I thought he put his dick in her mouth and tried to have sex with her again so he could finish." According to mother, "[victim] said that [J.B.] forced himself on her and she he [*sic*] said it lasted about a minute or—got away from him and then she was going to get sick. She didn't throw up, but she was nauseous and that's when he tried to have sex with her again." Mother acknowledged that she had initially told officers that J.B. attempted to put his penis in victim's mouth when she was bent over. Mother, however, testified that she had subsequent conversations with victim and she now understood that when victim bent over, J.B. attempted to put his penis back inside her vagina again.

The prosecutor asked mother when she spoke with the police officer, and if that was when mother told the officer that she thought victim had said that when she was bent over, J.B. tried to force her to orally copulate him. Defense counsel objected, arguing that victim's hearsay statement was not a fresh complaint or a prior consistent statement. The prosecutor maintained that victim's hearsay was a prior consistent statement, and he anticipated that victim would be impeached when she testified at trial. Defense counsel

12

argued, "The complaining witness has not testified yet, so I would ask the Court to, if the Court's going to accept this, that it be subject to a motion to strike."

The juvenile court responded, "But it's her prior consistent statement, not the complaining witness's. That's what [the prosecutor is] trying to get to. He's not trying to get to the complaining witness's prior consistent statement, he's trying to get to hers." The juvenile court also stated, "Although it's not for the truth of what her daughter told her necessarily, it's more to as [*sic*] originally anticipated. In total, it's more to see if her statements to the police were accurate or inaccurate." The juvenile court subsequently concluded, "I have a good idea of what happened. Apparently it sounds like there was a couple of different conversations with daughter. Original conversations were interpreted one way, clarification came about 30 days after the police interviewed [mother]."

The juvenile court then asked defense counsel if he "heard something different" or if had issues with what the juvenile court's understanding of the evidence. Defense counsel responded, "I will submit the matter to the Court. I think I made my objections."

### 2. *General Legal Principles and Standard of Review*

Under the Evidence Code, hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated*." (Evid. Code, § 1200, subd. (a), italics added.) Unless the hearsay evidence falls within an exception to the hearsay rule, an out-of-court statement is inadmissible for its truth. (*Id*., subd. (b).)

"Evidence of a previous statement made by a witness is admissible under the prior consistent statement exception to the hearsay rule if there has been an express or implied charge that the witness's testimony is recently fabricated and the prior consistent statement was made before the motive for fabrication is alleged to have arisen. (Evid. Code, §§ 1236, 791.)" (*People v*. *Crew* (2003) 31 Cal.4th 822, 843.) "In evaluating the admissibility of prior consistent statements, the focus is on 'the specific agreement or

13

other inducement suggested by cross-examination as supporting the witness's improper motive.' " (*Ibid*.)

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 723.)

### 3. *The Statement Was Admitted for a Nonhearsay Purpose*

J.B. argues that the juvenile court erroneously admitted mother's testimony recounting victim's statement that J.B. tried to have sex with her again after she felt sick and was bent over, and J.B. tried to put his penis inside of victim's vagina again.[5] J.B. argues that victim's clarifying statement to mother was inadmissible hearsay and did not qualify as a prior consistent statement under Evidence Code sections 1236 and 791.

We agree that the statement was inadmissible as a prior consistent statement. At trial, J.B. made the implied charge that victim was motivated to fabricate her trial testimony out of a desire to appease her new boyfriend, who was upset after he learned about what had happened between victim and J.B. Under Evidence Code section 791, subdivision (b), a prior consistent statement offered after an express or implied charge of fabrication must have been "made *before* the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Italics added.) Victim's boyfriend already knew about what had happened with J.B. before victim made her disclosure to mother, so victim's prior consistent statement that J.B. attempted to have sex with her again was not made before the alleged motive for fabrication had arisen. Therefore, the statement was not a prior consistent statement under Evidence Code sections 791 and 1236.

---

[5] As we have stated, mother testified as follows: "[Victim] said that [J.B.] forced himself on her and she he [*sic*] said it lasted about a minute or—got away from him and then she was going to get sick. She didn't throw up, but she was nauseous and that's when he tried to have sex with her again."

Nonetheless, we conclude that the juvenile court did not abuse its discretion when it admitted victim's clarifying statement because the statement was not hearsay as it was not admitted "to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Rather, the juvenile court admitted victim's clarifying statement "to see if [mother's] statements to the police were accurate or inaccurate." In other words, victim's statement was not admitted to prove the truth of what she had stated—that J.B. tried to have sex with her again when she was bent over. The statement was admitted to prove that mother misunderstood victim when victim made her initial disclosure to mother, and that victim never made an inconsistent statement in the first place. Thus, even if the statement did not fall within any exceptions to the hearsay rule, such as the exception for a prior consistent statement, the juvenile court did not err in admitting the evidence.

### 4. *There Was No Prejudice*

Moreover, even if victim's clarifying statement was admitted for its truth, reversal is not required because J.B. cannot demonstrate that he was prejudiced. "Ordinarily, an improper admission of hearsay . . . constitute[s] statutory error under the Evidence Code." (*People v. Sanchez* (2016) 63 Cal.4th 665, 685.) We analyze prejudice due to statutory error under the standard described in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which requires reversal only when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

J.B. argues that the error was prejudicial because the case against him turned on victim's credibility. In part, J.B. relies on *People v. Zaheer* (2020) 54 Cal.App.5th 326. In *Zaheer*, the Fourth Appellate District concluded that the defendant's counsel had rendered ineffective assistance by failing to establish that the defendant was driving his own car when he sexually assaulted the victim because there was evidence that the defendant's car's locking mechanism did not work in the way that the victim described.

15

(*Id*. at pp. 332, 339.) *Zaheer* noted that the error was prejudicial because of the "strong indications this was a close case that turned entirely on [victim's] credibility." (*Id*. at p. 339.) *Zaheer*, however, does not stand for the proposition that *all* trial errors are prejudicial if a case turns on a victim's credibility.

In this case, victim's hearsay statement was not particularly probative of victim's credibility; thus, the error was not substantial. (See *People v. St. Andrew* (1980) 101 Cal.App.3d 450, 465.) Mother confirmed at trial that she had initially told officers that when victim first told her about the assault, victim said that J.B. tried to have her orally copulate him when she was bent over. Mother's explanation that victim *subsequently* made a clarifying statement did not eliminate the alleged inconsistency between victim's statements. Had victim's clarifying statement been excluded, the juvenile court would have been required to make nearly the same factual determination and assessment of victim's credibility—either mother misinterpreted victim's statement the first time victim made her disclosure, or victim initially told mother a different version of events.

J.B. argues that prejudice is demonstrated because victim's hearsay dulled the impact of the inconsistency between victim's initial statement to mother about the assault and her testimony at trial. J.B. also argues that there were multiple other inconsistencies in victim's testimony that raised doubts about her credibility, such as her initial claim that she had not spoken to J.B. after the incident until they exchanged Instagram messages. Victim later testified that she and J.B. had spoken to each other over FaceTime before they exchanged messages on Instagram.

However, just as there was evidence that harmed victim's credibility, there was evidence that cast doubts on J.B.'s credibility. J.B. apologized to victim in both the apology letter that he wrote in front of Detective Stenger and in the Instagram messages that he sent to victim. In the Instagram messages to victim, J.B. described himself as a "monster." In one Instagram message, he responded, "I didn't hear u say no [victim] I

16

promise you I didn't hear u." In a later message, J.B. then seemingly acknowledged that victim had said no, sending a message that read, "It was once u pulled everything up that I realized it ok I'm so sorry." After his interview with Detective Stenger, J.B. apologized for lying to the officer.

Furthermore, J.B. largely did not dispute the overarching sequence of events. J.B. testified that victim orally copulated him, J.B. then orally copulated victim, and J.B. and victim subsequently had consensual sex. J.B.'s testimony largely mirrored victim's description of the order of what happened—victim testified that J.B. forced her to orally copulate him, J.B. orally copulated her, and then J.B. penetrated her vagina with his penis and had sex with her. At issue was whether victim consented to J.B.'s advances or whether J.B. forcibly raped victim, and victim's hearsay statement to mother that J.B. attempted to have sex with her was of marginal probative value. Both victim and J.B. extensively testified at the jurisdiction hearing, and the juvenile court was able to assess both of their demeanors firsthand and make determinations about their credibility. Evidence that victim may have made a prior inconsistent statement to mother tended to impeach victim's credibility, but the effect of the impeachment was, when considering the entire record, relatively weak. Thus, victim's later clarifying statement to mother had little prejudicial impact. In fact, the juvenile court acknowledged in its written order that there was an inconsistency between victim's initial statement to mother and her statement to the police, but "disagree[d]" with J.B.'s argument that the inconsistency "show[ed] that she [was] making the whole thing up."

After a careful review of the record, and to the extent victim's clarifying statement was admitted for its truth, we conclude that because the statement did not strongly rehabilitate or bolster victim's credibility, it is not reasonably probable that J.B. would have received a more favorable verdict had the statement been excluded. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

17

B. *Probation Conditions*

J.B. challenges probation conditions Nos. 11 (search condition), 13 (prohibition on owning, possessing, or having control over a dangerous or deadly object), and 16 (prohibition on knowingly associating with a probationer or a parolee) on the grounds that they are unreasonable under *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*). J.B. also argues that probation condition No. 13 is unconstitutionally overbroad and condition No. 14 (prohibition on possessing, owning, or controlling firearms until he turns 30 years old) is unauthorized because it cannot be lawfully imposed under any circumstance.[6]

1.  *General Legal Principles and Standard of Review*

In ordering a ward under its jurisdiction to probation, the juvenile court " 'may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced.' . . . 'A condition of probation which is impermissible for an adult criminal defendant is not necessary unreasonable for a juvenile receiving guidance and supervision from the juvenile court.' " (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1118 (*Ricardo P.*).) " ' "In planning the conditions of appellant's supervision, the juvenile court must consider not only the circumstances of the crime but also the minor's entire social history." ' " (*In re Binh L.* (1992) 5 Cal.App.4th 194, 203 (*Binh L.*).)

Under the *Lent* test, " '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not itself criminal, and (3) requires or forbids conduct which is not

---

[6] J.B. objected under *Lent* to probation condition Nos. 11, 13, and 16. J.B. did not object to probation condition No. 13 on constitutional grounds, but an objection is not necessary if the constitutionality of the probation condition is a pure question of law that can be resolved without referencing the sentencing record in the case. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, 889 (*Sheena K.*).)

18

reasonably related to future criminality." ' [Citations.] The *Lent* test 'is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term.' " (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1118; *Lent*, *supra*, 15 Cal.3d at p. 486.)

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.)

We review a juvenile court's imposition of a probation condition for an abuse of discretion. (*In re Malik J.* (2015) 240 Cal.App.4th 896, 901.) However, "[w]hether a probation condition is unconstitutionally overbroad presents a question of law reviewed de novo." (*In re P.O.* (2016) 246 Cal.App.4th 288, 297.)

### 2. *Probation Condition No. 11*

Probation condition No. 11 states: "That said minor submit his person, property, or any vehicle owned by said minor or under said minor's control, to search and seizure by school officials while on school campus or during school events." When J.B. objected to the condition on the grounds that it was unreasonable under *Lent*, the juvenile court justified the condition by stating, "And search and seizure I believe is important so I did order search and seizure." J.B. argues that the condition satisfies all three prongs of the *Lent* test and argues that his offense did not involve any evidence that a search would have discovered, the condition does not relate to conduct that is criminal, and it is not reasonably related to his future criminality.

"[A] minor cannot be made subject to an automatic search condition." (*Binh L.*, *supra*, 5 Cal.App.4th at p. 203.) Welfare and Institutions Code section 730, subdivision (b) provides that when the ward is placed on probation, "[t]he court may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." The power of the juvenile court is even broader than that of the

19

criminal court because of the juvenile court's rehabilitative function, and " ' "[a] condition of probation which is impermissible for an adult criminal defendant is not necessarily unreasonable for a juvenile receiving guidance and supervision from the juvenile court." ' " (*Binh L.*, *supra*, at p. 203.) "But every juvenile probation condition must be made to fit the circumstances and the minor." (*Ibid.*) Thus, a juvenile court "must consider whether, in light of 'the facts and circumstances in each case' [citation], the burdens imposed by the [search] condition are proportional to achieving some legitimate end of probation." (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1127.)

Accordingly, general search conditions like the one at issue in this case have been routinely upheld in juvenile cases depending on the applicable facts and circumstances. (See, e.g., *In re Abdirahman S.* (1997) 58 Cal.App.4th 963, 968-969 [minor aided in an assault with a deadly weapon]; *Binh L.*, *supra*, 5 Cal.App.4th at p. 204 [minor committed an auto theft].)

Here, the general search condition that was imposed by the juvenile court was reasonably related to J.B.'s future criminality and fails to satisfy the third prong of the *Lent* test. (*Lent*, *supra*, 15 Cal.3d at p. 486.) Although J.B.'s offenses did not take place in his vehicle, he committed his offenses at a secluded area of the school campus. A search of his vehicle while J.B. is at school can reduce the possibility that he could commit similar offenses in the future. Moreover, a search of his person and property can assist the probation officer with ensuring J.B.'s compliance with other conditions of his probation, which he does not challenge on appeal, such as the conditions that prohibit him from possessing drug paraphernalia, alcohol, or controlled or illegal substances. (See *People v. Olguin* (2008) 45 Cal.4th 375, 381 (*Olguin*) [condition requiring notification of presence of pets reasonably related to future criminality because it serves to protect probation officer who is charged with supervising probationer's compliance with specific probation conditions].)

20

Additionally, the search condition in this case is not unduly burdensome on J.B.'s privacy.[7]  (C.f. *Ricardo P*., *supra*, 7 Cal.5th at pp. 1118, 1127-1129 [burden of electronics search condition was substantially disproportionate to legitimate interests in promoting rehabilitation and public safety].)  The condition that was imposed in this case is not unrestricted; it is limited to searches when J.B. is on school campus or at school events.  J.B. is not subject to an automatic search of his person or property at all times.  As a result, the search condition here does not impose a burden that is "substantially disproportionate to the legitimate interests in promoting rehabilitation and public safety," and the juvenile court did not abuse its discretion in imposing it.  (*Ricardo P*., *supra*, 7 Cal.5th at p. 1129.)

### 3.  *Probation Condition No. 13*

Probation condition No. 13 states:  "That said minor not knowingly own, use, possess, or have control over an object that is dangerous or deadly such as a knife, blackjack or dirk; or knowingly own, use, possess, or have control over an item that is not necessarily deadly or dangerous such as a bat, if possessed with the intent to use as a weapon."  J.B. argues that the condition's prohibition of his use or possession of a "knife" is unreasonable and unconstitutionally overbroad.[8]  When J.B. objected to the condition, the juvenile court responded that the condition was "nonnegotiable because [J.B. committed] violent felonies."

---

[7] In his opening brief, J.B. also argues that "public embarrassment is another of the condition's burdens."  J.B., however, does not cite to any cases or authority for the proposition that the potential for embarrassment can make a probation condition unduly burdensome.  Moreover, as we have stated, the condition that was imposed in this case was not a blanket search condition, and whether any searches would be in public or cause J.B. embarrassment is purely based on speculation.

[8] J.B. does not challenge the portions of the condition relating to blackjacks, dirks, or items that are "possessed with the intent to use as a weapon."

21

First, we reject J.B.'s argument that the condition is unreasonable under *Lent*. The condition's prohibition against knives is reasonably related to future criminality and therefore does not satisfy the third prong of the *Lent* test. (*Lent*, *supra*, 15 Cal.3d at p. 486.) The juvenile court considered J.B.'s offenses to be violent felonies. J.B. forced victim into having sex and forced victim to orally copulate him by holding onto her neck. Although J.B.'s offenses did not involve weapons, the juvenile court could reasonably believe that the prohibition against dangerous and deadly weapons, including knives, serves to deter J.B.'s ability to commit even more serious violent felonies in the future.

J.B. argues that as written, the condition is unreasonable because it prohibits him from using any knife for any purpose, including for routine tasks like chopping onions. The condition, however, does not prohibit J.B. from possessing, controlling, or using *all* knives. The condition specifies that J.B. is prohibited from using objects that are *dangerous or deadly*, including knives.

Relying on *People v. Aledamat* (2019) 8 Cal.5th 1, J.B. argues that a knife is not an inherently deadly or dangerous weapon, and the term "dangerous or deadly" as used in the condition does not limit the prohibited objects to those considered deadly weapons as a matter of law. In *Aledamat*, the California Supreme Court determined that "[b]ecause a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*Id.* at p. 6.) A knife, however, can be a dangerous or deadly instrument " 'depending upon the manner in which it is used.' " (*Ibid.*)

Contrary to J.B.'s claim, we find *Aledamat* supports our interpretation of the probation condition. As a knife is not inherently dangerous or deadly, the probation condition can only be reasonably interpreted to prohibit knives that are dangerous or deadly in the manner in which they are *used*. "A probation condition should be given 'the meaning that would appear to a reasonable, objective reader.' " (*Olguin*, *supra*, 45 Cal.4th at p. 382.) "We interpret a probation condition in context and using 'common

22

sense.' " (*People v. Prowell* (2020) 48 Cal.App.5th 1094, 1102.) In this case, a contextual reading of the condition does not lead a reasonable person to believe that the condition applies to a kitchen utensil.[9] Thus, it was not an abuse of discretion for the juvenile court to impose this probation condition.

For these same reasons, we reject J.B.'s claim that the condition is unconstitutionally overbroad because it limits his constitutional right to possess property (Cal. Const., art. I, § 1). As interpreted, the condition is closely tailored to its purpose—prohibiting J.B. from owning, using, possessing, or controlling dangerous and deadly weapons, including those knives that are possessed or used as a dangerous or deadly weapon. (See *Sheena K., supra*, 40 Cal.4th at p. 890.) Accordingly, the condition is not unconstitutionally overbroad.

### 4. *Probation Condition No. 14*

Probation condition No. 14 states: "That said minor shall immediately surrender any and all firearms in his or her possession, custody and control and refrain from possessing, owning, or controlling any and all firearms until his or her 30th birthday." J.B. did not object to this probation condition below, but he contends that an objection was unnecessary because the condition is unauthorized because the juvenile court will lose jurisdiction when J.B. turns 21 years old (or 25 years old at the latest). (Welf. & Inst. Code, § 607, subds. (a), (b), (c), (d), (e).) He further argues that the condition is redundant because section 29820 already prohibits him from possessing firearms until he

---

[9] J.B. observes that a knife can be used as a deadly or dangerous weapon and the second half of the probation condition that prohibits the possession or use of items possessed with an intent to use the item as a weapon could validly include knives. The fact that the second half of the probation condition is duplicative as to the prohibition against knives does not render the first half of the condition unreasonable under *Lent*.

turns 30 years old. Thus, he argues that the condition should be modified by striking the words "until his or her 30th birthday."

We find no merit in J.B.'s claim that the probation condition as imposed is unauthorized. An unauthorized sentence is one that "could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).) J.B. himself acknowledges that the probation condition echoes the requirements of section 29820, which prohibits minors who commit offenses, including rape with force, violence, or threat of great bodily harm, from owning or possessing firearms until age 30. (§ 29820; Welf. & Inst. Code, § 707, subd. (b)(4).) In other words, the imposed probation condition does nothing more than reiterate the statutory restrictions imposed by section 29820 and does not constitute an unauthorized sentence. Thus, J.B.'s challenge to this condition has been forfeited by his failure to object below. (*People v. Welch* (1993) 5 Cal.4th 228, 234-235.)

### 5. *Probation Condition No. 16*

Probation condition No. 16 states: "That said minor not knowingly associate with any person whom he knows to be, or that the [p]robation [o]fficer informs him to be, a probationer or parolee." When J.B. objected to the condition on *Lent* grounds, the juvenile court stated, "I don't expect to ask [J.B.'s] friends if they're on probation or parole, but if you were to learn—frankly, it would be important that [J.B.] involve himself with prosocial peers."

Here, probation condition No. 16 satisfies the first two prongs of the *Lent* test. Associating with probationers or parolees has no relationship to J.B.'s offenses and associating with probationers or parolees is not in itself a criminal act. (*Lent*, *supra*, 15 Cal.3d at p. 486.) The issue is thus whether the condition satisfies the third *Lent* prong, whether the condition is not reasonably related to J.B.'s future criminality. (*Ibid*.)

24

J.B. argues that this court's decision in *People v. Brandão* (2012) 210 Cal.App.4th 568 (*Brandão*) is instructive on this point. In *Brandão*, which was cited with approval by the California Supreme Court in *Ricardo P.*, *supra*, 7 Cal.5th at page 1121, the defendant, who was convicted of possessing methamphetamine, challenged a probation condition prohibiting him from associating with gang members. (*Brandão*, *supra*, at pp. 570-571.) Nothing in the record indicated that the defendant had any gang affiliations or gang-related history, and his offense was not gang-related. (*Id*. at p. 576.) This court concluded that the probation condition was not reasonably related to the defendant's future criminality. (*Id*. at p. 575.)

*Brandão* considered a probation condition imposed on an adult probationer, and juvenile courts have wider discretion in imposing probation conditions on minors. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 910 [probation condition that would be improper for adult probationer may be permissible for minor under supervision of juvenile court].) Nonetheless, "[a] condition that would be improper for an adult is permissible for a juvenile only if it is tailored specifically to meet the needs of the juvenile." (*In re Edward B.* (2017) 10 Cal.App.5th 1228, 1233 (*Edward B.*).) Accordingly, in *Edward B.*, the First Appellate District struck a condition prohibiting a minor from associating with known gang members and gang associates after concluding that there was no factual nexus between gangs and the minor's offense and there was no evidence of gang affiliation, association with gang members, or risk of gang involvement. (*Id*. at p. 1236.) In the absence of such evidence, "the gang condition [was] not tailored to [the minor's] future criminality." (*Ibid*.)

Although *Brandão* and *Edward B.* considered gang association conditions, the reasoning in those cases applies equally here. Although there are situations where

restricting contact with probationers and parolees may be reasonably related to future criminality, facts that would support such a conclusion are not present in this case.[10] Our holding is narrow. Here, there is no evidence in the record to indicate that J.B. was in danger of associating with probationers or parolees, or that he was in danger of succumbing to negative social influences. The juvenile court stated that it believed it was important for J.B. to "involve himself with prosocial peers," but there was nothing in the record to indicate that he was doing anything to the contrary. The probation report stated, "[J.B.] is involved in school sports and does not affiliate with gangs . . . . His friends consist of his teammates and childhood friends." The probation report also stated, "[J.B.] is surrounded by a supportive, proactive family in a stable environment . . . . Additionally, [J.B.] is involved in prosocial activities and does not associate with negative peers." Furthermore, the record reflects that J.B. did not have a history of delinquency.

Based on the record before us, we conclude that the probation condition is not "tailored specifically to meet [J.B.'s] needs" (*Edward B.*, *supra*, 10 Cal.App.5th at p. 1233), as not every probation condition "bearing a remote, attenuated, tangential, or diaphanous connection to future criminal conduct can be considered reasonable" (*Brandão*, *supra*, 210 Cal.App.4th at p. 574). It would be speculative to argue that J.B. might start to associate with probationers or parolees, and neither the circumstances of

---

[10] For example, in *People v. Robinson* (1988) 199 Cal.App.3d 816, the First Appellate District found that a probation condition prohibiting a defendant who was convicted of transporting and selling cocaine from associating with "anyone of known criminal record" was reasonable under *Lent*. (*Id.* at p. 817.) The Court of Appeal observed that the condition was related to the defendant's offense because "drug dealers frequently possess lengthy criminal records," and the condition would assist the defendant in successfully completing probation. (*Id.* at p. 818.)

the offense nor J.B.'s personal history indicates an association with antisocial individuals. Thus, we shall order probation condition No. 16 stricken.

## C. *The Restraining Order*

Finally, J.B. argues that this court should vacate the five-year restraining order that was imposed against him because its duration exceeds the applicable statutory limits.

### 1. *Background*

At J.B.'s first appearance on May 2, 2019, the juvenile court issued a temporary restraining order. About a month later, the temporary restraining order was extended until J.B.'s next hearing date. On July 25, 2019, the juvenile court extended the temporary restraining order to July 27, 2020. The juvenile court stated that it was going to impose a "restraining order after [a] hearing," and the restraining order would be a "permanent order for one year." J.B. made no objection to the extension of the restraining order.

Finally, on December 20, 2019, the juvenile court stated that it intended to extend the restraining order for five years. The juvenile court asked, "Should we do that now?" The juvenile court then acknowledged that there was a "head nod yes in the back" of the courtroom. Defense counsel stated, "That's fine, your Honor." Thereafter, the juvenile court stated that the restraining order would expire in five years on December 20, 2024.

### 2. *Analysis*

Welfare and Institutions Code section 213.5, subdivision (b) grants the juvenile court the authority to issue a restraining order in certain circumstances when a petition has been filed to declare a child a ward of the court under Welfare and Institutions Code sections 601 or 602. Under Welfare and Institutions Code section 213.5, subdivision (d)(1), "[t]he juvenile court may issue, upon notice and a hearing, any of the orders set forth in subdivisions (a), (b), and (c). A restraining order granted pursuant to this subdivision shall remain in effect, in the discretion of the court, no more than three

27

years, unless otherwise terminated by the court, extended by mutual consent of all parties to the restraining order, or extended by further order of the court on the motion of any party to the restraining order."

J.B. acknowledges that he did not object to the restraining order below, but he argues that it could not be lawfully imposed and was thus an unauthorized sentence that can be challenged at any time. "[T]he 'unauthorized sentence' concept constitutes a narrow exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal." (*Scott*, *supra*, 9 Cal.4th at p. 354.) "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*Ibid*.) In contrast, "claims deemed waived on appeal involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner." (*Ibid*.)

Here, J.B., through defense counsel, expressly consented to the extension of the restraining order to five years. The juvenile court told the parties that it intended to extend the restraining order, and defense counsel stated, "That's fine, your Honor." The restraining order was not unauthorized because it could have been lawfully imposed *had* the juvenile court obtained the consent of all parties or *had* it extended the order after a party made a motion under Welfare and Institutions Code section 213.5. In other words, the restraining order in this case was imposed in a "procedurally or factually flawed manner" and did not result in an unauthorized sentence. (*Scott*, *supra*, 9 Cal.4th at p. 354.) Thus, J.B.'s failure to object below has forfeited his argument on appeal. (*Ibid*.)

### III. DISPOSITION

The juvenile court's disposition order is modified by striking probation condition No. 16. In all other respects, the disposition order is affirmed.

28

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
DANNER, J.

*People v. J.B.*
**H047828**